In the Matter of the Estate of SAMUEL J. SONDERLING, Deceased.

Surrogate's Court, Westchester County, April 25, 1935.

*Mitchell, Taylor, Capron & Marsh* [*Charles Angulo, Thomas K. Egan* and *Benjamin Nassau* of counsel], for the accountant.

*Emil Goldmark* [*Walter M. Schwarz* of counsel], for the Federation for the Support of Jewish Philanthropic Societies of New York City.

*Bachrach, Bachrach & Bisgyer* [*Clarence G. Bachrach* of counsel], for the Brooklyn Federation of Jewish Charities.

*Abraham Wilk* [*Edgar J. Bernheimer, Harry T. Zucker* and *Sydney J. Schwartz* of counsel], for the committee for Lena Sonderling.

*Curtis, Mallet-Prevost, Colt & Mosle*, for the University Settlement Society.

*David L. Podell*, for the Educational Alliance.

*Proskauer, Rose & Paskus*, for the Mount Sinai Hospital.

*Chadbourne, Stanchfield & Levy*, for Marion E. Beckman.

*Stroock & Stroock*, for the Montefiore Hospital for Chronic Diseases.

*Robert P. Smith*, special guardian.

SLATER, S. Samuel J. Sonderling died November 30, 1933. His will, dated June 30, 1933, was probated on December 28, 1933, upon the petition of the City Bank Farmers Trust Company, one of the executors named in the will. His sole next of kin was his mother, Lena Sonderling, an incompetent. In the probate proceeding a special guardian was appointed for her. In his report to the court he sought to obtain a determination as to the validity or effect of certain gifts contained in the will and to what extent they might be illegal and invalid because of the intervention of section 17 of the Decedent Estate Law. The will was admitted to probate and the question raised in the report of the special guardian was reserved for further determination.

In March, 1934, upon the petition of the executor, the court construed paragraph seventh of the will. The construction related to whether the executor and trustee had the power to sell real property. It was decided that the decedent had granted a power of

sale to the executor and trustee respecting the real property. The decedent was a certified public accountant and drafted his own will, which was typed and prepared for execution by his secretary.

By the second paragraph of the will the testator gave general legacies in the amount of $25,000 to charitable corporations; by the third paragraph of the will he gave general legacies of $33,000 to members of his family; by the fourth paragraph of the will he gave certain articles of personal property to his sister. The fifth paragraph frees the gifts from any transfer or other tax burden. The sixth paragraph of the will gives " all the rest, remainder and residue of my property " to executors and trustees for the following uses: (a) $100,000 in trust for the mother; (b) $100,000 in trust for a sister, Mamie; (c) $100,000 in trust for a sister, Rose; (d) $10,000 in trust for a sister, Eve; (e) the balance of income of the estate to be paid " to the respective Federations for the Support of Jewish Philanthropic Societies in New York and Brooklyn in equal parts;" (f) after the death of the mother the trust fund created for her is " donated " to the " Federation for the Support of Jewish Philanthropic Societies of New York, *together with the principal sum* yielding the income donated in subdivision e," to be utilized for the construction of a building. " Upon the death of each of the remaining life tenants named in paragraph VI the principal of each fund shall be paid to the Federation for the Support of Jewish Philanthropic Societies of New York to be held as a Permanent Fund, the income thereof to be applied in the discretion of the Federation trustees, for general or special purposes. The Funds shall be known as ' Samuel Joseph Sonderling Fund, in memory of his parents Israel and Lena Sonderling.' "

A question of misnomer arose with regard to the gift to the two charities receiving the income and corpus of the remainder of the estate. Oral testimony has been taken to aid the court to ascertain the intent of the testator. There are no corporations bearing the names of the two federations as set forth in the will, but there are corporations bearing the names of " Federation for the Support of Jewish Philanthropic Societies of New York City " and " Brooklyn Federation of Jewish Charities."

I hold that it was the intention of the testator to make his gift to the " Federation for the Support of Jewish Philanthropic Societies of New York City " and " Brooklyn Federation of Jewish Charities."

The Supreme Court appointed Reuben Sonderling and Rose Siegel as committee of the person and property of the mother, Lena Sonderling, an incompetent person, on January 23, 1934. It directed the committee to file objections to the account of proceedings with reference to the application of section 17 of the Decedent

Estate Law. Such objection was filed. The committee filed further objections to the account as follows: (1) That the executor failed to charge itself with interest at two per cent upon substantial balances; (2) that the executor failed to invest cash balances in temporary interest-bearing securities during the administrative period, seeking to surcharge such executor with six per cent interest upon uninvested balances.

The special guardian filed a report herein.

With regard to the objection seeking a surcharge for interest on cash balances: The account shows that the decedent had only a small amount of cash at the time of his death. The will failed to permit the trustees to hold non-legal securities. The usual functions of executors or administrators are the payment of debts, marshalling of assets, the conduct of the business of the testator, if any, the setting up of trusts, if any, and the distribution of the property of the estate to those entitled under the will. All these duties are supposed to be performed in seven months from the date of letters. In order to pay debts and set up the trusts with legal securities, it became the duty of the executor in the administration of the estate to sell securities in a timid market quite unready to absorb large lots of securities. This it started to do in January, 1934, and continued to sell until June 19, 1934, the entire amount sold being $465,297.39.

The objectors say that, when the executor acquired this large amount of money from the sale of securities, it failed to receive interest on the cash balances as provided for by subdivision 11 of section 188 of the Banking Law, as it existed prior to May 11, 1934.

The accounting executor contends that on September 28, 1933, the New York Banking Board suspended operation of subdivision 11 of section 188 of the Banking Law as it had the power to do by chapter 41 of the Laws of 1933, effective March 7, 1933, when it was authorized to suspend any provision of the Banking Law in whole or in part (*Moses* v. *Guaranteed Mortgage Co. of New York*, 264 N. Y. 476); that in June, 1933, the Federal Banking Act of that year, section 11 B, amended section 19 of the said Reserve Act (U. S. Code, tit. 12, § 371-a), and added a new paragraph which said: " No member bank shall, directly or indirectly by any device whatsoever, pay any interest on any deposit which is payable on demand." These laws were passed at the time of the National crisis in the banking conditions of the country.

Subdivision 11 of section 188 of the Banking Law was amended by chapter 501 of the Laws of 1934, in effect May 11, 1934, which made the statute *thereafter* applicable only to moneys held on " *time deposits.*" Moneys deposited in banks by executors or adminis-

trators are *demand* deposits. Executors, trustees and administrators were in a position where they could not secure interest upon demand deposits. The law forbade it. Up to May 11, 1934, the provisions of the Banking Law requiring the payment of interest on cash balances at the rate of two per cent had been suspended. After that date the amendment removed the requirement except on " time deposits." Proposed legislation before the present Legislature provides for a rate under certain conditions. The proposed law provides for the future. This objection is dismissed.

This leads to the consideration of the further objection that the executor should have withdrawn the money and invested it in some short-term government securities. Should the executor be surcharged for the interest on the amount that could be secured in a short-term security? As the statute forbids the banks to grant interest upon demand deposits, the question is raised as to whether the ordinary conduct of fiduciaries has been violated by not investing in temporary investments. There is a paucity of decisions on the question. A few months elapsed between the time when a substantial amount was received by the sale of securities and the time when the sum was invested. I consider the lapse of time in this case as a not unreasonable time for reinvestment. This objection is dismissed.

Passing to the more important question presented to the court: It is the contention of the committee (1) that the charities are entitled to one-half of the estate, less debts, as of the date of the decedent's death *without any allowances for interest or otherwise for postponement;* (2) that the legal title to one-half of the real estate is vested in the incompetent; (3) that the share of the incompetent's interest in the estate is presently payable.

The account of proceedings charged the executors with the appraised value of the personal property at death at.. $522,891 13
Real estate................................... 56,500 00

    Total...................................... $579,391 13
The debts at death amounted to................... 62,251 41

The net estate is................................ $517,139 72

One-half of which, $258,569.86, charity may take. The petition in this accounting proceeding shows that there is an increase of $42,031.06 over the appraised value at death.

The question relates to whether the terms of the will infringe upon the provisions of section 17 of the Decedent Estate Law. This section, in force prior to September 1, 1930, is to the effect that no

person having a husband, wife, child or descendant or *parent*, shall by his or her last will and testament give to any benevolent, charitable, literary, scientific, religious or missionery society, association, corporation or purpose, in trust or otherwise, more than one-half of the estate after the payment of debts, and such devise or bequest shall be valid to the extent of one-half and no more. The amendment by chapter 229 of the Laws of 1929, effective September 1, 1930, added these words: " The validity of a devise or bequest for more than such one-half may be contested only by a surviving husband, wife, child, descendant or parent. When payment of a devise or bequest to such society, association, corporation or purpose is postponed, in computing the one-half part of such society, association, corporation or purpose, no allowance may be made for such postponement or for any interest or gains which may accrue after the testator's death."

No question was raised as to the right of the committee of the incompetent, under direction of the Supreme Court, to assert the incompetent's right to test the validity and to fix, if necessary, the amount that would become residuary or intestate property because of the intervention of section 17 of the Decedent Estate Law. (*Matter of Hills*, 264 N. Y. 349.)

The will gave the whole estate to charities, less the gift of some household effects and $33,000 in money legacies to the family. It is obvious that the statute relating to gifts to charitable corporations is violated. No one is contending otherwise. To ascertain the half which the charities may take, the estate of a testator as at death, less his debts, should be taken as the basis of computation. The statute limits the amount of the gifts to charitable corporations and the effect of this is to change the gifts to these charitable corporations from a gift of a residuary estate, uncertain in amount, to a fixed sum measured by half the estate, less the debts. Thus the gift of the residuary estate to the Federation for the Support of Jewish Philanthropic Societies of New York City is changed into a general legacy of a certain amount. This gift, together with the gifts to other charities, make up the half permitted by law to be received. The other half, in such case, becomes the *residuary estate* and, as such, must bear the expenses of administration. (*Matter of Brooklyn Trust Co.*, [2d Dept.] 179 App. Div. 262, 264.)

The rule of law that general legacies are payable ahead of the residuary gift is changed by the application of section 17 of the Decedent Estate Law. (*Matter of Brooklyn Trust Co., supra; Matter of Seymour*, 239 N. Y. 259; *Matter of Gardner*, 151 Misc. 342.) A general charitable legatee may not be preferred against the other charitable legatees. All charitable gifts are added together and

must not exceed one-half of the estate, less debts, and consequently, in the instant case, they must prorate. To ascertain whether the gift to charity exceeds the limit permitted, it may be stated that the whole estate passes to charity upon the termination of the intervening trusts. The value of these trust estates, based on mortality tables, is $132,772.72. Deducting this sum from the total estate of $517,139.72, less debts, there is a balance of $384,367 as the value of the remainder interest to the charities. This exceeds one-half of the estate, less debts, and the terms of the statute are violated. The gift to all the charities becomes one of $258,569.86.

The rule of law laid down in *Matter of Franklin Trust Co.* ([2d Dept.] 190 App. Div. 575), that, where a trust estate intervenes, distribution of the principal cannot be made, must be observed. (*Matter of Milhau*, 151 Misc. 283, 288; *Matter of Innerfield*, 153 id. 706, 711.) A valid trust estate must terminate before making a distribution. It would answer no useful end and would be more dangerous in these times of financial stress than in any other period to attempt to settle a point that may arise under a will creating estates in expectancy. The amount of the estate ultimately to be received by the charities may be fixed, based upon the date of death and the value of appraised real and personal property, less debts. Under the terms of the will, what is to pass to the charities is gathered up and forms part of the trust estates. The trusts are good and hence the court in this accounting proceeding cannot set aside as presently payable any definite sum which will pass as residuary estate to the sole next of kin. (*Matter of Waddell*, 129 Misc. 495.) Delivery of the residuary estate, so called, created by the interference of section 17 of the Decedent Estate Law, is impossible while the trusts are outstanding. (*Matter of Loewenthal*, 138 Misc. 871.)

To anticipate the possibility of increase or decrease of the corpus of the trust funds would be futile. The corpus of the trust funds might become so depleted by losses beyond the control of even the trustees that, when the time arrived to pay the amount to the charities, there would be little or nothing left to become the so-called residuary estate passing to the sole next of kin. While it is improbable that such a condition will occur, still it is just as likely as some of the unexpected losses that have come to and have exhausted trust funds in other estates. Legacies and all other charges have to be paid and a residuary estate is just what the word implies — what may be left. (*Matter of Smallman*, 138 Misc. 889, 916; *Matter of McArdle*, 147 id. 876, 881.)

September 1, 1930, is the dividing time affecting the question of division between charities and heirs, created by chapter 229 of the

Laws of 1929. Up to that date *Matter of Seymour* (239 N. Y. 259) permitted the payment of interest on the deferred gifts to charities. Since that date, there have been no decisions in the Court of Appeals involving the interpretation and effect of the new provision of section 17 of the Decedent Estate Law. For cases dealing with the new provisions, see *Matter of Apple* (141 Misc. 380 [June, 1931]); *Matter of McArdle* (147 id. 876 [June, 1933]); *Matter of Miranda* (151 id. 459 [May, 1934]); *Matter of Lord* (155 id. 628). In the instant case the gifts may go up to the stoppage limit set out in section 17, so the interpretation of the added words to section 17 need not be here considered.

In the instant case the charities named in the second paragraph of the will, together with the Federation for the Support of Jewish Philanthropic Societies of New York City, will prorate the fixed sum of $258,569.86 as representing one-half of the estate to be paid them. The amounts to be fixed by prorating are presently payable to the charities who take fixed sums named in the second paragraph. The amount prorated to the Federation for the Support of Jewish Philanthropic Societies of New York City will be paid to it upon the termination of each trust term. The half passing as intestate property, called the " residuary estate " in *Matter of Brooklyn Trust Co. (supra)*, bears all the administration expenses, payment of legacies to non-charitable legatees, taxes and other burdens. What is left as this half at the termination of the trusts becomes the residue passing to the sole next of kin as distributee. This sum cannot be determined nor paid while the trusts are in existence. (*Matter of Bullard*, 225 App. Div. 734; affd., 253 N. Y. 562; *Matter of Brown*, 135 Misc. 611.) As each measuring life ends, the sum of money so released may be first used to pay the prorated half passing to the Federation for the Support of Jewish Philanthropic Societies of New York City. Whenever this half has been fully paid, without allowance for postponement, or interest, the balance may be distributed to the sole next of kin or whoever represents her estate.

The " gain " of the estate, if any, now indicated as $42,031.06, is retained within the trusts. Its distribution is subject to future determination at the end of the trust terms. It must await the vicissitudes of the times.

A question arises with regard to the real property, whether it passes in part to the charitable trusts and to Lena Sonderling, the heir at law or distributee, or whether it should be treated as a part of the general estate. It is not necessary to determine its lodgment at this time, as it, too, is enveloped in the trust estates. The real property was devised as residuary estate to the trustees. When the time arrives to determine the question, the rule laid down in *Matter of Dowe* (144 Misc. 350), and cases cited, all affecting wills probated

prior to September 1, 1930, will need to be considered; also whether the testator evidenced an intent that his real and personal property be merged and brought into one general fund; also, the effect of the removal of the distinction between real and personal property as regards intestate distribution which was abolished by chapter 229 of the Laws of 1929 (Dec. Est. Law, § 81); also, whether this statutory provision renders inapplicable the prior decisions, such as *Matter of Brown (supra)*.

In the instant case an *immediate* distribution of real property is not possible. Where an immediate distribution is proper, it is a mooted question whether equity will grant a proportionate share of both *real* and personal property to the next of kin and to the charity.

Submit decree in accordance herewith on two days' notice to all attorneys appearing.