155 Cal.App.3d 979 (1984)
202 Cal. Rptr. 855
Estate of CLIFFORD B. PITZER, Deceased.
NEIL T. BURTON, as Executor, etc., et al., Petitioners and Respondents,
v.
SECURITY PACIFIC NATIONAL BANK, as Trustee, etc., Objector and Appellant.
Docket No. 69713.
Court of Appeals of California, Second District, Division Five.
May 16, 1984.
*982 COUNSEL
Gibson, Dunn & Crutcher, Robert S. Warren, Marsha McLean-Utley, Newman, Chrisman & Faith and J. Randall Faith for Objector and Appellant.
William M. Shernoff and Leonard Sacks for Petitioners and Respondents.
OPINION
STEPHENS, Acting P.J.
This action represents the second of two appeals[1] initiated by Security Pacific Bank (hereinafter Security Pacific) concerning the summary judgment and surcharges rendered against it by the probate court as a result of objections filed by the beneficiaries of a testamentary trust to Security Pacific's trust account. Specifically, the probate court determined that Security Pacific, in making a loan of $115,000 to Park Lane Development Company (hereinafter Park Lane), the ultimate purchaser of certain trust property, breached its trust as a matter of law. The court also adjudged that a well located on trust property sold had a value separate and independent of the value of the land, and that Security Pacific had neither requested nor received any consideration for this well. As a consequence, a surcharge was imposed against Security Pacific.
Security Pacific contends that the summary adjudication ruling as to the $115,000 loan is unsupported by legal precedent, is contrary to established principles governing fiduciary conduct and is thus in error. It is also alleged that there is no substantial evidence to support the probate court's surcharge for the value of the water well separate and independent of the land, or the surcharge for Security Pacific's failure to obtain interest on the purchase price of the land during escrow. We conclude that the granting of summary judgment as well as the surcharges were proper and affirm the judgment accordingly.

*983 FACTS
On November 15, 1974, Security Pacific was named trustee under a testamentary trust created by the will of Clifford B. Pitzer. Named as trust beneficiaries therein were plaintiffs and respondents, Fern Taylor Pitzer (Pitzer's surviving wife),[2] and his children, John L. Pitzer and Patricia P. Lautmann.
In his will, Clifford Pitzer appointed respondent, Fern Taylor Pitzer, to act as executrix of his estate. Certain specific bequests of real and personal property, as well as a bequest of the residue of his estate, were then conveyed to Security Pacific, in trust. Security Pacific was granted full, complete and absolute discretionary powers regarding trust management and maintained the right to sell trust assets.[3] The principal assets of the trust estate consisted of securities, sundries and 20 acres of lemon groves. Security Pacific was requested to manage the trust property for the benefit of respondents until such property was sold.
Security Pacific took possession of the real estate and other property on July 19, 1974. When the bank assumed its duties as trustee, the 20 acres of lemon groves were being maintained for the production of commercial crops. The 20 acres consisted of 3 parcels, one of 10 acres and 2 contiguous parcels of 5.5 and 4.5 acres, respectively. Various sundries included a well with a pump, a pumphouse used to irrigate the groves, an oil pump, a truck and three wind machines. Also included as part of the trust fund was a revolving fund consisting of moneys obtained by certain packing house cooperatives engaged in the marketing of the produce of the groves. The originally reported value of the property, water rights and sundries was $382,000.[4]
As administration of the trust proceeded, Security Pacific's operation of the lemon groves resulted in a net loss. Consequently, to produce income for the trust beneficiaries, Security Pacific offered for sale and sold the parcels[5] to Edward Bell, a land developer (hereinafter Bell). Included in the sale was the transfer of ownership in the well, the various sundry items and the revolving funds.
*984 Prior to the close of escrow, and nearly one year into the escrow, another branch of Security Pacific loaned $115,000 to the ultimate purchaser[6] of the south tract of the property. As security for that loan, Security Pacific took back a deed of trust covering the trust property. At the close of escrow, Security Pacific then transferred to Park Lane the title to this property. At this same time, however, respondents, as beneficiaries, voiced their concern and displeasure with the sale and the overall administration of the trust. Security Pacific then tendered and the probate court accepted its resignation as trustee. Three months later, Security Pacific made a $1,915,200 construction loan to Park Lane.
On December 9, 1976, a complaint for breach of trust, breach of statutory duties and constructive fraud was filed on behalf of respondents, naming Security Pacific and various individuals as defendants. Respondents alleged that Security Pacific breached its trust by selling trust property at substantially less than its fair market value; by failing to seek or obtain legal advice; by charging excessive trustee's fees; by transferring trust property without consideration by transferring the well owned by the trust, thereby compromising the water rights then held by respondent John Pitzer; by making gifts of trust property (the sundries), and by failing to pay the trust income to respondent Fern Pitzer, the life beneficiary of the trust. Respondents sought recovery for emotional distress and punitive damages for oppressive, fraudulent or malicious management of the trust.
On January 13, 1977, Security Pacific filed its proposed second and final account and petitioned for approval of the same acts and transactions of which the beneficiaries complained in the civil complaint. On February 18, 1977, Security Pacific filed a demurrer to the complaint in the civil action and argued, inter alia, that the order of the court in the probate action was res judicata as to the claims of respondents in the civil matter. The demurrer was sustained with leave granted therein to amend and to file a cause of action for intentional infliction of emotional disturbance. The court further noted that, but for the heretofore mentioned cause of action for intentional infliction of emotional disturbance, all matters raised in the complaint were within the jurisdiction of the probate court. Respondents thereafter filed a first amended complaint and Security Pacific's subsequent demurrer thereto was overruled.
On March 29, 1977,[7] respondents filed proposed objections to Security Pacific's accounting which incorporated by reference those objections as set *985 forth in their civil action complaint. On July 26, 1977, respondents filed a notice of motion to consolidate the civil action and their objections to the accounting. That motion was argued and denied without prejudice.
A few years later, on May 21, 1980, Security Pacific filed a motion for judgment on the pleadings which was denied. At that same time, respondents reinitiated a motion to consolidate the probate and civil actions. That motion was granted.
In June of 1981, pursuant to the provisions of Code of Civil Procedure section 437c, Security Pacific moved for a summary judgment claiming that it did not breach its trustee duties under Civil Code sections 2228 and 2229 by lending Park Lane the respective sums of $115,000 and $1,915,200. Respondents filed their own motion for summary judgment seeking an adjudication that the two loans did violate the trustee's duties. Security Pacific's motion was denied as was respondents' motion concerning the $1,915,200 loan. The court, however, granted respondents' motion for summary judgment as to the $115,000 loan.
On November 30, 1981, the consolidated matter came on for trial. Security Pacific's motion to bifurcate the probate and civil proceedings and to proceed initially with the probate accounting and objections was denied. A jury was thereafter impaneled for the purpose of adjudicating the civil matter.
The court decided that it would hear and determine the probate trust accounting matter concurrently with the jury trial of the civil action. It thereafter denied Security Pacific's motion to dismiss the civil action complaint for failure to state a cause of action. Respondents were then permitted to amend their complaint to state a cause of action on behalf of John Pitzer, individually, for alleged tortious interference with his water rights.
On December 31, 1981, the trial court announced its partial tentative decision with respect to the probate issues. The court's findings, revealed outside of the presence of the jury, concluded that Security Pacific had breached its trust by the manner in which it handled the sale of the property, by its transferring the sundries without consideration, and by its dealing with the trust property as security for a loan made by it.
On February 8, 1982, the trial court rendered its judgment with respect to the objections to Security Pacific's accounting. In the probate trust accounting proceedings, the trial court found that certain, but not all, of Security Pacific's conduct complained of constituted a breach of trust. As a *986 result, a total surcharge of $25,020.05 was assessed. Security Pacific thereafter filed this appeal.

I
(1a) Security Pacific initially contends that the summary adjudication ruling as to the $115,000 loan is unsupported by legal precedent and is contrary to established principles governing fiduciary conduct. It argues that there exists no authority supporting the proposition that a loan by a trustee of its own funds to a third party which was used by that third party to acquire trust property constituted an impermissible self-dealing.[8] Respondents, on the other hand, insist that there is no authority condoning such a loan.
(2) We begin our discussion with the acknowledgment that on an appeal from a summary judgment, the appellate court has the duty to determine whether a triable issue of material fact exists. (Scott v. Farrar (1983) 139 Cal. App.3d 462, 466 [188 Cal. Rptr. 823].) Code of Civil Procedure section 437c, subdivision (c), sets forth the procedure for summary judgment. That section provides:
"The motion shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, ... and all inferences reasonably deducible from such evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from such evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (Italics in original.)
(3) A motion for summary judgment is therefore appropriate only where no triable issue of material fact exists and where the moving party's affidavits set forth sufficient facts to sustain a judgment in its favor. (Bank of Beverly Hills v. Catain (1982) 128 Cal. App.3d 28, 33 [180 Cal. Rptr. 67].)
While we have not discovered nor been cited to any California case directly on point, the court in Estate of Wemyss (1975) 49 Cal. App.3d 53 [122 Cal. Rptr. 134] considered an analogous set of circumstances. In Wemyss, the beneficiary of a testamentary trust petitioned the superior court for removal of the Bank of Stockton as executor and testamentary trustee *987 of the estate. It was alleged in the petition for removal that the bank had acted in a manner that resulted in a breach of fiduciary duty and a conflict of interest. Factually, the decedent, Wemyss, entered into an agreement to sell his corporate stock and his sole proprietorship in a local Coca-Cola Bottling Company. The purchase was to take effect upon the death of Wemyss and payment to decedent's estate was to be $250,000 down with the balance of $550,000 to be represented by a promissory note secured by a chattel mortgage on the assets of the sole proprietorship and a pledge of the corporate stock. Following the death of Wemyss,[9] the Bank of Stockton, as executor, petitioned the probate court for an order directing a transfer of the property in accordance with the terms of the contract and the modification. The purchaser made all required payments in a timely fashion, then borrowed an additional $150,000 from the Bank of Stockton to be used for capital improvements on the property. A note was given for the loan secured by a deed of trust on the corporate real property. The loan was further secured by a security instrument on certain personal property owned by the corporation.
The court concluded that the conduct of the bank in its capacity as a commercial lender was not adverse to the fiduciary interest it held as trustee for the estate. It stated that "A loan by the commercial department, unless made to secure an advantage to the bank adverse to the estate, does not require removal of the bank as trustee." (Estate of Wemyss, supra, 49 Cal. App.3d at p. 61; italics added.) Finally, it determined that the evidence presented therein at best disclosed a mere potential conflict for which the beneficiary's petition failed to provide sufficient evidence of mismanagement or actions detrimental to the estate or the beneficiary's interest. (Ibid.)
In In re Lerch's Estate (1960) 399 Pa. 59 [159 A.2d 506], cited by the court in Wemyss, decedent, under his will, created a trust of his residuary estate under which the net income of the trust was to be paid to decedent's widow during her lifetime. Upon her death, the balance of his estate was to be divided into four equal parts. A trust company, named as sole trustee, was authorized, inter alia, to retain or to sell any securities or investments owned by decedent and to make investments, all at its discretion. The trust company was granted a minority share of preferred and common stocks in a hosiery company. That company at the time was indebted to the commercial department of the trustee. After financial difficulties beset the company, the trust company, acting in conjunction with the other stockholders including some of the beneficiaries, agreed to sell the corporate stock of the corporation. *988 Subsequently, the trustee's commercial department loaned money to the company at the same time that it, as trustee, held title to a minority interest in the stock.
Appellant, as beneficiary, filed suit alleging, among other things, that the trustee breached its fiduciary duty by making said loan. The Supreme Court of Pennsylvania, however, approved such a loan and stated that "the trustee merely made periodic loans of money from its commercial department to [the company] and no purchase of any asset of the commercial department was made with any funds of the trust estate. To hold such a corporate loan in violation of fiduciary duty would impose undue and unnecessary restriction upon commercial banking." (In re Lerch's Estate, supra, 159 A.2d at p. 513.)
Similarly, in Braman v. Central Hanover Bank & Trust Co. (1946) 138 N.J. Eq. 165 [47 A.2d 10, 25], a beneficiary of a testamentary trust challenged a sale of shares of common stock by the trustee, Central Hanover Bank, and alleged that the sale was made at an inadequate and unconscionable price. An accounting for profits on a bank loan was also sought as a result of the following occurrence. During the administration of the trust, the company in which the stock was sold had borrowed substantial sums from the bank. It was alleged that since the bank, as trustee, made large loans to the company, the stock of which company constituted 90 percent of the trust estate, the bank thereby used its position as a stockholder to profit by its dealing with the company. It was also alleged that as a result of this dealing, the bank's position as a creditor of the company was inconsistent with that of the trustee owning a large block of stock in that company. The court evidenced that on the day of the first loan, the company, as lendee, had been a depositor of the bank for 15 years. "It was the bank's money, not that of the trust estate, which was loaned, and the opportunity to make the loan did not arise from the trust relationship.... And while `a trustee may not take a position whereby self-interest might induce him to relax the obligation he owes to the cestuis, or that would pit his own advantage against their welfare' [citations], the loans ... involve no self-dealings and no breach of trust." (47 A.2d at p. 25.)
Based upon the preceding cases, it is clear that a factual determination surrounding the circumstances of each loan was necessary for the court to determine whether or not a breach of trust had resulted. (4) Accordingly, as a matter of law, the outright loan by the commercial department of a bank or lending institution to a third party, for the purchase of trust property, where that lender also acts as testamentary trustee representing the sale of that trust property does not constitute an impermissible act of self-dealing or conflict of interest absent sufficient evidence of same. Resultingly, *989 a granting of summary judgment based exclusively upon this misconception of the law would be improper absent sufficient evidence of self-dealing or conflict of interest.
(1b) In the instant matter, however, the court's stated reasoning for the granting of respondents' summary judgment motion does not exclusively rely on a finding of a breach "as a matter of law."[10] Accordingly, a review of the moving papers, supporting documents and inferences raised and reasonably deducible from the record is appropriate. (See Royster v. Montanez (1982) 134 Cal. App.3d 362, 367 [184 Cal. Rptr. 560].)
As with most summary judgment appeals, the issue concerns the existence or nonexistence of triable material issues of fact. (See Pettis v. General Tel. Co. (1967) 66 Cal.2d 503, 505 [58 Cal. Rptr. 316, 426 P.2d 884].) Upon careful review of the pleadings and written evidence supplied by both parties (see Stationers Corp. v. Dun & Bradstreet, Inc. (1965) 62 Cal.2d 412, 417 [42 Cal. Rptr. 449, 398 P.2d 785]), we conclude that no triable issue of material fact remains and that a breach of trust as a matter of law did result.
Factually, it is undisputed that the loan to Park Lane was not made from funds of the Pitzer trust but was made from the bank's general fund. Significantly, Security Pacific's own motion for summary judgment provides valuable insight to the remainder of the pending issues.
In its motion to determine that the $115,000 loan made by it to Park Lane to fund the purchase of the trust property was not a violation of its duties as a trustee under Civil Code sections 2228 and 2229, it states that "Security Pacific is not seeking summary judgment as many of the issues present factual controversies which can only be resolved following trial. However, Security Pacific believes that the issues presented by the loans which the Bank made to Park Lane Development Co. do not involve any factual dispute and can be decided as a matter of law. ... [¶] Security Pacific contends *990 that there is no dispute regarding the facts surrounding the loans.... [¶] Court should rule that as a matter of law, SECURITY PACIFIC loans to Park Lane were not improper and did not violate the Bank's fiduciary duties." (Italics added.)
Since it is conceded that material issues of fact do not exist nor are raised in the moving or opposing papers, the question remains as to whether sufficient evidence of self-dealing or conflict of interest exists in those undisputed facts as represented in the record to have warranted the granting of respondents' motion for summary judgment.
Those facts reveal that in early 1976, two separate agreements for the sale of the two parcels of trust property (the lemon groves) were executed based upon an offer by Bell. The first agreement provided for payment of $120,000 ($12,000 per acre) cash for the south 10 acres. The second agreement required payment of $24,000 cash payable on close of a one-year escrow and a note for $96,000 at 8-1/2 percent interest per annum to be dated as of date of the acceptance of the offer by Security Pacific.[11] Security Pacific accepted the offer and escrow opened on March 8, 1976.[12] Respondents then objected to the sale, complaining of a mishandling of the trust. Bell thereafter initiated certain development work and obtained a tentative tract map on the south 10-acre parcel.
On July 9, 1976, Security Pacific modified the terms of the escrow pursuant to which Bell released all claims to the lemon grove's revolving funds which were gratuitously included in the sale. In exchange for the release of the fund, Security Pacific paid Bell $2,000.
On July 16, 1976, Bell sold the south 10 acres of the property to Olson & Wells Development, Inc.[13] On February 18, 1977, the escrow agreement was modified to reflect the transfer. On the same date, the escrow agreement was further modified, pursuant to the parties' agreement, to reflect that the grant deed was to be drawn in favor of Park Lane.[14]
On December 9, 1976, respondents commenced their civil suit. On January 5, 1977, Security Pacific commenced negotiations for a loan with Park *991 Lane. Security for the loan was to be that portion of the trust real property which Park Lane had purchased. In February of 1977, Mr. Olson, of Olson & Wells, made a formal loan request on behalf of Park Lane. At the time of the request, Security Pacific had made numerous loans to several entities with which Olson & Wells were associated, including Park Lane.
In late February, Security Bank approved the loan to Park Lane in the amount of $115,000. Park Lane used the loan funds to close the escrow on the south 10-acre parcel. A deed of trust in favor of Security Pacific to secure the loan was thereafter recorded.
Security Pacific received repayment of the loan on May 23, 1977. Repayment was made out of the proceeds of a subsequent development loan of $1,915,200. As a result, Security Pacific earned between $2,004.50 and $2,274 interest.[15] Based upon these facts, a summary adjudication that the loan was or was not a breach of trust was sought by both parties.
Civil Code section 2228 states that "In all matters connected with [its] trust, a trustee is bound to act in the highest good faith towards his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind."
Section 2229 states that "A trustee may not use or deal with the trust property for his own profit, or for any other purpose unconnected with the trust, in any manner."
The lower court determined that the making of the $115,000 loan for its own benefit was self-dealing on the part of the trustee, from which self-dealing $2,004 in earned interest accrued to the trustee for its corporate purse. During the pendency of the one year escrow transaction through which the trust property was to be conveyed, Security Pacific created its entitlement to receive the aforesaid sum of $2,004 (see fn. 15, ante) by contracting to lend the sum of $115,000 to Park Lane and agreeing to take back as security for said loan a deed of trust covering the very property it then held in trust. This constituted an impermissible dealing with trust property for the trustee's[16] own profit.
*992 Clearly, a profit (the interest) was made as an indirect/direct[17] result of Security Pacific's dealing with the trust property while it was trustee.
Additionally, when Security Pacific took as security for its loan a deed of trust covering the same portion of the trust real property that Park Lane had purchased, it acted in violation of Civil Code section 2229.
In Purdy v. Johnson (1917) 174 Cal. 521, 529 [280 P. 181], the Supreme Court determined that a trustee which used trust property to secure repayment of advances made personally was assuming a position antagonistic to that of their beneficiaries and any resulting advantage or profit was deemed in law to belong to the beneficiaries. While the factual distinctions between Purdy and the instant action are obvious, the basic rationale between the court's determination comports with the intended purpose of section 2229.
Finally, the argument that it would be intolerable to hold Security Pacific "strictly liable" for an action undertaken with no knowledge of the impropriety (i.e., in good faith) is untenable. Good faith is irrelevant in an action for this type of breach. (See People of State of Cal. v. Larkin (N.D.Cal. 1976) 413 F. Supp. 978.)
The uncontroverted facts at present reveal that as a matter of law Security Pacific's actions do amount to self-dealing in contravention of section 2229,[18] as well as the trustee's breach of its duty of loyalty. (See Civ. Code, § 2228; Rest.2d Trusts, § 170, subd. 1, com. a, p. 364, com. c, p. 365.) Consequently, we conclude that summary judgment in favor of respondents was proper.

II
(5) Security Pacific next argues that no substantial evidence exists to support the probate court's surcharge for the value of the water well separate and independent of the land or for Security Pacific's failure to obtain interest on the purchase price of the land during escrow.
*993 On August 22, 1975, Security Pacific filed its trust account current and report of trustee. In that account, Security Pacific valued the real property at $368,927, water rights at $6,807, and sundries at $7,244. After several reappraisals, the property was marketed for $240,000 ($12,000 per acre.)[19]
The probate court determined that the $240,000 sale price of the real property exceeded its fair market value of $234,300 by $5,700. It concluded that the $234,000 did not include the value of the well which was appraised at $20,000 by Security Pacific's appraiser Martin. Consequently, Security Pacific was surcharged $14,300 ($20,000 less $5,700).
Evidence of five separate appraisals was provided at trial. Appraisals were that of Security Pacific's in house appraiser, and appraisals from Security Pacific's witnesses, Mr. Martin, an independent appraiser; Wheeler, the exclusive broker; and Bell, the purchaser.[20]
Security Pacific argues that the finding and subsequent surcharge by the probate court is unsupported and contradicted by Mr. Martin's testimony. It contends that the sole basis for the trial court's ruling was its misconception of Martin's testimony.
Mr. Martin, in pertinent part, testified as follows:
"Q. And did you reach a conclusion as to what your opinion was of the fair market value of the twenty-acres of property as of March 3, 1976?
"A. I did, sir.
"Q. Now, in forming your opinion as to the value, were you advised that there was a water well located on the trust property?
"A. Yes, on the northerly parcel, which you described  both ten-acre trusts  in any case, most northeasterly corner of the northerly parcel.
"Q. And as part of your opinion of the fair market value of the real property, did you consider the value or potential value of that well site?
"A. I did, sir."
Security Pacific insists that since the record refutes the sole basis upon which the trial court's funding was premised and no other evidence as to a *994 separate value of the well was acceptable to the court, the surcharge was invalid. Mr. Martin, in referring to an independent report (the Montgomery Report), also testified to the replacement cost as follows:
"Q. Let's break it down, then. What do they [the Montgomery Report] put replacement cost at?
"A. The replacement cost for developing, drilling and test pumping, approximately $35.00 per foot of depth, is $28,000; plus the case, $6100; plus the perforation, $3400; and the gravel pack, twenty-five cubic yards, $100; a total of those direct things was $37,600.
"And the equipment of Bols, twenty-one stage, $3200; column 550 feet of two-and-a-half inch outside and one-and-a-half inch inside shaft, $13,300; and discharge, $800; installation, $2000; shed, $1000; and miscellaneous was a thousand; for a total replacement cost of $62,000.
"Q. What other value, other than the replacement cost value, did the Montgomery Report include?
"A. Approximately $20,000.
"Q. And what did they label that?
"A. They labeled  it is sentence number three of this Identification Number 32. It says, `Based on the above estimates using the original cost less depreciation, total appraised value of the well and the existing equipment would be approximately $20,000.'"
While unquestionably Martin's appraisal of the property was inclusive of the well's value, the record reveals that, with the exception of his appraisal of the value of the well, the court did not rely exclusively upon Martin's opinions concerning the valuation of the trust property. Instead, the record reveals that the court's valuation of the entire property was based upon a consideration of all the expert valuations.[21] Furthermore, Martin's appraisal of the well was based upon findings of separate studies performed by four separate experts in the area of water evaluation. Since adequate evidence exists in the record that the value of the well was approximately $20,000,[22] we conclude that a surcharge was proper.

*995 III
(6a) Lastly, Security Pacific contends that without the benefit of proof, the probate court improperly imposed a surcharge for Security Pacific's failure to obtain interest on the purchase price during escrow. Security Pacific argues that there is no evidence that it could have negotiated a sale of the land for an all cash purchase price and interest payments on that price during escrow. It insists that the evidence merely established that long escrows were the normal, customary and required practice in land sales transactions such as the one at bar.[23]
Civil Code section 2259 states that "A trustee ... must use at least ordinary care and diligence in the execution of his trust." Section 2261, defining the degree of care and judgment necessary in performing authorized investments, states that "In ... selling ... property for the benefit of another, a trustee shall exercise the judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of their capital." (7) A bank engaged in the business of acting as a fiduciary for estates and trusts must exercise that skill and knowledge ordinarily possessed by such professional fiduciaries. (Estate of Beach (1975) 15 Cal.3d 623, 631 [125 Cal. Rptr. 570, 542 P.2d 994].)
(6b) A brief review of the pertinent facts reveals that Bell's offer of purchase was accepted on February 27, 1976, and escrow closed by a deed to Bell's assignee, Park Lane, on February 28, 1977, for a total escrow period of one year and one day. The closing was to have been for a cash down payment of $24,000 and the balance of $96,000 payable by a promissory note due one year from close of escrow. The closing statement of the escrow with respect to the sale of the southerly parcel did not indicate the payment of interest. Condition 18 of the offer granted to the purchaser the option to pay in cash rather than by note.
The court found that had the note for $96,000 been issued, dated as of February 27, 1976, the estate would have earned $8,160 in interest during the period prior to the closing. As a result "no income accrued to the estate *996 from the date of acceptance until the date of closing." It determined that a prudent trustee should have made some provision for the payment of some consideration during the time that the property was removed from the market.
Security Pacific concedes that Bell had agreed to pay interest on the promissory note from the date of its offer in exchange for the right to purchase the property on the terms as stated above. It thereafter subordinated its duty as trustee by making a loan to Bell's assignee so that a cash purchase from the estate could be consummated. This action benefited Bell, his assignee and the bank, not the trust. The essence of the transaction was to effectively deprive the trust of some $8,160 in interest it would have received had the transaction concluded as Security Pacific initially optioned. In turn, Security Pacific netted $2,276 in profit from the interest it earned on the loan. Thus, the loan made the interest income beneficiary the bank rather than the estate.
Certainly, a cash purchase rather than a purchase on terms is, as a rule, the preferred mode of transacting a land sale. Yet, in the instant matter, the credit option as offered by Security Pacific would have benefited the trust.
(8) Whether an investment or sale is proper depends upon the circumstances existing at the time the investment was made, rather than upon subsequent events. (Rest.2d Trusts, § 227, com. o, pp. 535, 537.)
(6c) Under the circumstances then prevailing, Security Pacific's failure to collect interest was an imprudent act in contravention of the trust's best financial interest. (See Civ. Code, § 2261.) Accordingly, the surcharge for interest uncollected on the southern parcel was proper.
The judgment is affirmed.
Ashby, J., and Stanton, J.,[*] concurred.
NOTES
[1] See Burton v. Security Pacific National Bank,[*] (Cal. App.) filed concurrently herewith.

[*] Reporter's Note: See footnote[*], ante, page 979.
[2] Subsequent to the entry of judgment, Fern Taylor Pitzer died and the executor of her estate, Neil Burton, was substituted as a party.
[3] Respondents, as beneficiaries, were not provided any consultation rights.
[4] Security Pacific's own internal document suggested a list price of the property of $410,000.
[5] Prior to sale of the parcels, respondent Fern Pitzer purchased and Security Pacific conveyed a 6,000-square-foot portion of the property for $3,500.
[6] Prior to close of escrow, Mr. Bell transferred his interest in the south 10-acre parcel to Park Lane.
[7] No opposition was presented until March 29, 1977, as a result of Security Pacific's filing of its proposed accounting without notice. By reason of this failure, the court's previous order approving the final accounting was vacated to permit respondents to file their objection.
[8] Security Pacific concedes that there may be factual circumstances under which such a loan could constitute a breach of trust. It merely insists that this is not one of them.
[9] The assets of the sole proprietorship were later transferred to the corporation. A modification of the agreement was also executed in which the purchaser received permission to form a new corporation and pledge its stock to the estate as security for the payment of the balance of the purchase price.
[10] The court's reference to a breach as a matter of law is to be read in the context presented:

"The orders on the summary judgment issues were, of course, not appealable orders, but no writ directed to the Court of Appeal was sought for the expungement or reversal of such orders prior to the time of trial. Such orders, therefore, became the law of the case for purposes of trial."
The court's order itself states as follows:
"It is FURTHER ORDERED that the motion for summary adjudication of issues brought by plaintiffs is granted as to the purchase money loan in the sum of $115,000.00 made by defendant SECURITY PACIFIC NATIONAL BANK as is more particularly described in plaintiff's moving papers...."
Respondents' [plaintiffs'] moving papers as well as Security Pacific's moving papers describe the issue presented as whether or not the lending of purchase and construction money by Security Pacific for the purchase and development of trust real property constitutes a breach of fiduciary duties as a matter of law.
[11] Condition 18 of the agreement provided the option of purchasing either 10-acre parcel for cash and the other on terms per the agreement (8-1/2 percent interest).
[12] The terms of the escrow granted Bell the right to close escrow separately on each parcel; title to be vested upon close of escrow in the name of Bell or his assignee with no further approval of the assignee required.
[13] Bell remained ready, willing and able to close escrow with his own funds had the assignee (Olson & Wells) failed to close.
[14] Park Lane was a general partnership consisting of Frontier Enterprises, Inc., G.A. Wells, Inc., and J. Donald Olson Co.
[15] Security Pacific apparently has two calculations of interest on file.
[16] In its motion for summary judgment, Security Pacific does not contend that the loan is justified because its trust department and commercial department are separate entities. Consequently, Security Pacific has relinquished the argument that its actions as trustee were distinct from its actions as commercial lender.
[17] The directness or indirectness of the profit is concededly open to varying interpretations. In this case, however, we deem such a fact insignificant.
[18] Security Pacific argues that by no stretch of the imagination could a conflict of interest be found in this case. We, however, can imagine one.

As a result of Security Pacific's securing its loan with a deed of trust on the trust property, it placed itself in a position whereby if the lendee defaulted, Security Pacific could obtain the opportunity to purchase the property from foreclosure at a fraction of the value. Consequently, an "end run" would result whereby Security Pacific would gain trust property as a direct result of its action initiated as trustee. Such action would again be of dubious validity under Civil Code sections 2229, 2231. (See also, Rest.2d Trusts, § 170, com. b, pp. 364-365.)
[19] Prior to the sale of the property to Park Lane, Mrs. Pitzer purchased a strip of property at a price equivalent to $25,000 per acre.
[20] Respondents offered no appraisal of the property.
[21] The court's valuation of the property based upon the figures presented in the record appears incorrect. Neither party, however, disputes the sum awarded or the value of the property excepting the obvious argument that no surcharge should have been awarded.
[22] Security Pacific itself offered $25,000 to recover the well. While Martin's appraisal surely appears tied to his original appraisal of the property as a whole, Security Pacific's buy-back offer was not.
[23] Security Pacific maintains that since the issue of the long escrow period and the acceptance of all cash was never raised prior to or on the day of trial, the trial court's ruling was made sua sponte after submission of all the evidence. Consequently, it alleges it was deprived of the opportunity to present evidence as to the benefits to the trust as the result of the all cash purchase during the one-year period. Accordingly, it infers that all this somehow resulted in the loss of an offsetting credit.
[*] Assigned by the Chairperson of the Judicial Council.