[No. B015445. Second Dist., Div. One. Sept. 19, 1988.]

TED E. VAN DE KAMP et al., Plaintiffs and Appellants, v.
BANK OF AMERICA, Defendant and Appellant.

820

824

### COUNSEL

Simon & Sheridan, Kevin O'Connell, Joan I. Samuelson, McDonough, Holland & Allen, Richard E. Brandt, Milo V. Olson, John J. Flynn III, Herbert Manasse, Haberfeld & Perlberger and Stephen E. Haberfeld for Plaintiffs and Appellants.

O'Melveny & Myers, Charles G. Bakaly, Jr., Ralph W. Dau, Karen R. Growdon, Tom A. Jerman, Richard Buckner, Mark A. Samuels, Brobeck, Phleger & Harrison and Edmond R. Davis for Defendant and Appellant.

### OPINION

### SPENCER, P. J.—

#### INTRODUCTION

Plaintiffs are Ted E. Van de Kamp, Jo Ann Williams, Susan Holsonbake, Joan Birdt, the Damon Runyon-Walter Winchell Cancer Fund and the class of similarly situated persons within Los Angeles County. They appeal from a judgment in favor of defendant Bank of America National Trust & Savings Association. Defendant cross-appeals from an order that the entire class of plaintiffs should bear the costs of the trial.

#### STATEMENT OF FACTS

In essence, plaintiffs challenge three of defendant's banking practices as those practices relate to trust and agency accounts. These practices are self-pooling and self-depositing, use of fail float, and use of disbursing float.

In self-pooling and self-depositing, defendant pooled cash balances in the accounts and invested them on a short-term basis. Defendant retained the profits from these investments.

Fail float arises in the context of buying and selling securities. The trust accounts are debited or credited five business days after the date the security is traded, whether or not defendant receives the security purchased or funds for the security sold. If the security fails to be delivered by the fifth day, defendant has the use of the purchase money until the security is received. Defendant did not return to the trust accounts any profits made on the use of fail float.

When a check is issued to pay trust obligations, the trust account is debited when the check is issued. The funds to cover the check are pooled and available to defendant for use until the check clears. Defendant did not return to the accounts any profits made on the use of this disbursing float.

Defendant did not disclose to the beneficiaries of its trust accounts or the principals of its agency accounts that it engaged in the foregoing practices. Further relevant facts are contained in the discussion portion of this opinion where appropriate.

## PROCEDURAL BACKGROUND

Plaintiffs filed this suit on April 23, 1979, seeking damages and an injunction, setting forth 10 causes of action for breach of fiduciary duty, fraud, unjust enrichment, unfair competition, unfair and deceptive practices, and negligence. The cause of action for unfair and deceptive practices was dropped in the second amended complaint.

Following demurrers, the trial court ruled the class of plaintiffs must be limited to those whose trusts were properly administered by the Superior Court of Los Angeles County. The case was then certified as a class action.

The case originally was set for a jury trial. Defendant moved to vacate the setting for jury trial on the ground the action was equitable. The trial court agreed and vacated the setting for jury trial.

Defendant moved for summary adjudication of the issues regarding custodial agency accounts; the motion was granted. The case then went to trial on the issues relating to other types of accounts. Judgment in favor of defendant was entered on May 28, 1985.

Following entry of judgment, defendant filed a cost bill. Plaintiffs filed a motion to tax costs, also claiming costs should be allocable against the

entire class. The trial court denied the motion but ruled costs should be borne by the entire class.

## CONTENTIONS

*On Appeal*

### I

Plaintiffs contend the trial court erred in finding the self-deposit statutes excused defendant from its duty of loyalty and its duty to abide by the statutory rules against self-dealing by a trustee.

### II

Plaintiffs also contend the trial court erred in finding no fraud, unjust enrichment or unfair competition.

### III

Plaintiffs assert summary judgment erroneously was granted as to custodial agency accounts.

### IV

Plaintiffs further assert the trial court erred in concluding none of the challenged practices was unlawful with respect to "no-power" agency and trust accounts.

### V

Plaintiffs aver the trial court committed reversible error per se by depriving them of their constitutional entitlement to a jury trial.

### VI

Finally, plaintiffs aver the trial court erred in limiting the class to beneficiaries and principals of accounts subject to the jurisdiction of the Los Angeles County Superior Court.

*On Cross-appeal*

## VII

Defendant contends the trial court erred in ruling costs should be borne by the entire class of plaintiffs on a pro rata basis.

## DISCUSSION

*On Appeal*

## I

Plaintiffs contend the trial court erred in finding the self-deposit statutes excused defendant from its duty of loyalty and its duty to abide by the statutory rules against self-dealing by a trustee. We disagree.

### A. Duty of Loyalty

A trustee's duty of loyalty is codified in Probate Code section 16002 (added by Stats. 1986, ch. 820, § 40; formerly Civ. Code, § 2228, repealed by Stats. 1986, ch. 820, § 7; the new statutes, eff. July 1, 1987, apply to trusts created and all proceedings commenced before their effective dates (Prob. Code, § 15001)). Section 16002, subdivision (a), provides: "The trustee has a duty to administer the trust solely in the interest of the beneficiaries." In accordance with this duty, Probate Code section 16004, subdivision (a) (added by Stats. 1986, ch. 820, § 40; formerly Civ. Code, § 2229, repealed by Stats. 1986, ch. 820, § 7) provides in pertinent part: "The trustee has a duty not to use or deal with trust property for the trustee's own profit . . . ."

■ A trustee is duty bound to administer its trust solely in the interests of the beneficiary. (*Estate of Feraud* (1979) 92 Cal.App.3d 717, 723 [154 Cal.Rptr. 889]; Rest.2d Trusts, § 170, subd. (1), p. 364.) The trustee may not wield its power for its own "aggrandizement, preference, or advantage" to the exclusion or detriment of the beneficiary. (*Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 109 [81 Cal.Rptr. 592, 460 P.2d 464]; *Remillard Brick Co.* v. *Remillard-Dandini* (1952) 109 Cal.App.2d 405, 421 [241 P.2d 66].) Neither may the trustee place itself in a position where it would be to the trustee's benefit to violate its duty of loyalty to the beneficiary. (2 Scott on Trusts (3d ed. 1967) § 170, p. 1298.)

All benefits derived from the trust belong to the beneficiary. ■ As stated in *Savage* v. *Mayer* (1949) 33 Cal.2d 548, 551 [203 P.2d 9], dealing

with the similar fiduciary relationship of agent and principal: "An agent . . . is not permitted to make any secret profit out of the subject of his agency. [Citations.] All benefits and advantages acquired by the agent as an outgrowth of the agency, exclusive of the agent's agreed compensation, are deemed to have been acquired for the benefit of the principal, and the principal is entitled to recover such benefits in an appropriate action. [Citation.]"

■ There can be no secret profits allowed to the trustee, inasmuch as it owes to the beneficiary the duty of fullest disclosure of all material facts. (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 782 [157 Cal.Rptr. 392, 598 P.2d 45]; *Ford* v. *Cournale* (1973) 36 Cal.App.3d 172, 180 [111 Cal.Rptr. 334, 81 A.L.R.3d 704]; see Prob. Code, § 16060.) The trustee may not receive any personal advantage without full disclosure to the beneficiary. (See *Remillard Brick Co.* v. *Remillard-Dandini, supra,* 109 Cal.App.2d at p. 419.)

It does not matter that a trustee may have acted in good faith; self-dealing in violation of the duty of loyalty cannot be justified by the good faith of the trustee. (*Sims* v. *Petaluma Gas Light Co.* (1901) 131 Cal. 656, 659 [63 P. 1011]; *Estate of Pitzer* (1984) 155 Cal.App.3d 979, 992 [202 Cal.Rptr. 855].) Neither can the duty of loyalty be overcome by evidence of custom and usage in the banking industry. Custom cannot overcome positive provisions of statutes. (*Kohn* v. *Sacramento Electric, Gas & Ry. Co.* (1914) 168 Cal. 1, 7 [141 P. 626]; accord, *Crocker Nat. Bk.* v. *Byrne & McDonnell* (1918) 178 Cal. 329, 334 [173 P. 752]; *Hayward Tamkin & Co.* v. *Carpenteria Inv. Co.* (1968) 265 Cal.App.2d 617, 624 [71 Cal.Rptr. 462].)

B. *Right to Self-deposit*

■ The self-deposit statutes at issue here are statutes which allow a trustee to deposit trust funds with itself. Absent such statutes, it would be a clear violation of the duty of loyalty to make such self-deposits, placing the trustee in a position where it would benefit by violating the duty of loyalty, obtaining an advantage from the use of self-deposited funds to the detriment or exclusion of the beneficiary.

Probate Code section 16225, subdivisions (a) and (b) (added by Stats. 1986, ch. 820, § 40; formerly Civ. Code, § 2261, subds. (a) and (c), repealed by Stats. 1986, ch. 820, § 7), provides a trustee may deposit trust funds in an account in a bank operated by the trustee. Subdivision (e) of section 16225 (formerly Civ. Code, § 2261, subd. (d)) provides: "Nothing in this section prevents the trustee from holding an amount of trust property reasonably necessary for the orderly administration of the trust in the form of cash or

in a checking account without interest." Probate Code section 920.5 (repealed by Stats. 1987, ch. 923, § 46, reenacted as § 9705 by Stats. 1987, ch. 923, § 93) provides: "When a trust company [including a commercial bank (Fin. Code, § 107)] is an executor, administrator, special administrator, or administrator with the will annexed, and in the exercise of reasonable judgment deposits money of the estate in any department of the corporation of which it is a part, it shall be chargeable with interest thereon at the rate of interest prevailing among banks of the locality upon such deposits." Finally, Financial Code section 1562 provides in pertinent part: "Any trust company or bank authorized to engage in the trust business holding trust funds awaiting investment or distribution may deposit or leave on deposit such funds with any state or national bank" including the trustee-bank under certain conditions not relevant here.

 The ability of a trustee-bank to self-deposit is contrary to the general law of trusts, i.e., the duty of loyalty, creating a conflict of interest. (*Conservatorship of Pelton* (1982) 132 Cal.App.3d 496, 502 [183 Cal.Rptr. 188].) It also is contrary to the trustee's duty not to use trust property for its own benefit (Prob. Code, § 16002), inasmuch as the bank benefits when trust monies are deposited in its commercial side (Levmore, *Bank Trust Departments and "Float" Revenue: Finding the Proper Procedures* (1981) 98 Banking L.J. 817, 824).

Plaintiffs cite several cases for the proposition the right to self-deposit does not overcome a trustee's duty of loyalty. In *Conservatorship of Pelton, supra,* 132 Cal.App.3d 496, the bank, as conservator, in accordance with Civil Code section 2261, subdivision (3) [later renumbered as subdivision (c) (Stats. 1984, ch. 1372, § 1)] deposited with itself estate funds in a passbook account, although the money could have earned twice as much interest in another type of account. The court observed, that the bank was authorized to make such a deposit did not mean the deposit was proper. (132 Cal.App.3d at pp. 501-502.) The court stated: "The built-in incentive for a bank-conservator . . . to retain the estate assets for as long a period as possible at as low an interest rate as possible must be clearly scrutinized. We therefore conclude that where a bank-trustee places trust funds on deposit with itself at a rate of interest which is less than would have been earned by a deposit of like size over a similar period of time, the bank bears the burden of proving that the circumstances reasonably known to it at the time the investment decision was made justified the lower interest account." (*Id.,* at p. 502.)

Similar are *Cheyenne-Arapaho Tribes of Okl.* v. *United States* (Ct. Cl. 1975) 512 F.2d 1390 and *Manchester Band of Pomo Indians, Inc.* v. *United States* (N.D.Cal. 1973) 363 F.Supp. 1238. In these cases, the United States

held funds in trust for the Indian tribes. These funds were invested in the Treasury at 4 percent interest, as allowed by law; the law also allowed other investment options for the money.

In *Manchester Band of Pomo Indians,* the court held the United States, as trustee, was obligated to administer the trust solely in the band's interest, to account for any money made by it in the administration of the trust and to use reasonable care and skill to make the trust property productive. (363 F.Supp. at p. 1245.) While the United States was authorized to invest the band's money in the Treasury at 4 percent interest, it was not wholly free to do so where investment elsewhere would obtain a higher return. (*Id.,* at p. 1247.) Thus, investment of the band's money in the Treasury at 4 percent interest constituted a breach of the United States' fiduciary duty to the band. (*Ibid.*)

In *Cheyenne-Arapaho Tribes,* the court specified the United States' fiduciary duty to the tribes includes the " 'obligation to maximize the trust income by prudent investment.' " (512 F.2d at p. 1394.) This obligation was not necessarily met by depositing the tribes' money in the Treasury at 4 percent interest, even though such investment was allowed. (*Id.,* at pp. 1395-1397.) The United States bore the burden of justifying a less than maximum return on the investment.

The foregoing cases indicate there must be a balance struck between the trustee's duty of loyalty and right to self-deposit trust funds; the right to self-deposit does not overcome the duty to maximize returns on investment of trust funds. The cases do not, however, address the particular practices at issue here.

Inasmuch as the trustee's duty of loyalty and right to self-deposit are defined by statute, rules relating to statutory construction are instructive in discerning the relationship between the two. Civil Code sections 2228 and 2229 were enacted in 1872 and remained unchanged through July 1, 1987. Civil Code section 2261 also was enacted in 1872; subdivision (c) was enacted in 1943 (Stats. 1943, ch. 811, § 1). Probate Code section 920.5 was enacted in 1931 (Stats. 1931, ch. 281, p. 648) and Financial Code section 1562 in 1951 (Stats. 1951, ch. 364, p. 907). The self-deposit statutes all postdate the statutes defining the duty of loyalty.

Plaintiffs argue the self-deposit statutes cannot be read to repeal Civil Code sections 2228 and 2229, now Probate Code sections 16002 and 16004. ■ Generally, it will not be presumed the Legislature intended to repeal, in whole or in part, existing statutes by a later enacted statute in the absence of an express declaration to that effect. (*Fuentes* v. *Workers'*

*Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].) As a matter of policy, " 'it should not "be presumed that the Legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication." ' " (*Ibid.*)

Repeals by implication are not favored; they will be recognized only where there is no rational basis for harmonizing potentially conflicting statutes. (*Ibid.*) The presumption is against repeal by implication where express terms are not used and the statutes are not irreconcilable. (*People* v. *Martin* (1922) 188 Cal. 281, 285 [205 P. 121, 21 A.L.R. 1399]; *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 54 [69 Cal.Rptr 480].)

■ Where the conflict is between a general statute and a special statute, the special statute will be considered an exception to the general statute. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 420 [128 Cal.Rptr. 183, 546 P.2d 687]; *State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1979) 88 Cal.App.3d 43, 58 [152 Cal.Rptr. 153].) However, the special statute will work a repeal by implication only where it is in direct conflict with the general statute, repealing the general statute only to the extent the two statutes are irreconcilable. (*Governing Board* v. *Mann* (1977) 18 Cal.3d 819, 828 [135 Cal.Rptr. 526, 558 P.2d 1]; *State Compensation Ins. Fund, supra,* at p. 58.)

■ Civil Code sections 2228 and 2229, or Probate Code sections 16002 and 16004, may be considered general statutes, while the self-deposit statutes may be considered special ones. Clearly, there is a conflict between them. (See *Conservatorship of Pelton, supra,* 132 Cal.App.3d at p. 502.) The duty of loyalty requires the trustee to act solely in the beneficiaries' interest and not to use trust property for its own profit. (Prob. Code, §§ 16002, 16004.) The self-deposit statutes allow the bank-trustee to use money deposited in its commercial side for its own benefit, as it uses other funds deposited with it. The question, then, becomes, to what extent are the general statutes repealed by implication by the special statutes?

Defendant cites two cases in support of its position profit from self-depositing is permitted, but neither of these cases define the extent to which a bank may profit thereby without violating its duty of loyalty. In *Estate of Buchman* (1955) 138 Cal.App.2d 228 [291 P.2d 547], the bank, as special administrator of decedent's estate, deposited estate funds in both commercial and savings accounts within the bank. It was found the bank had discretion to do so, but it was claimed that under Probate Code section 920.5 the bank was obligated to pay interest on the funds deposited in

commercial accounts. The court ruled the bank was not obligated to do so. Section 920.5 required banks to pay interest "at the rate of interest prevailing among banks of the locality upon such deposits"; inasmuch as local banks did not ordinarily pay interest on commercial checking accounts, the bank was not required to pay interest on estate funds deposited in commercial accounts. (At pp. 238-239.) ■ This case shows a bank may have the use of estate funds without paying interest thereon when they are deposited in a commercial account.

*Estate of Smith* (1931) 112 Cal.App. 680 [291 P.2d 547] dealt with sections 25 and 32 of the Bank Act; these sections provided one department of a bank could not receive deposits from another department, and trust funds could not be commingled with other funds, except that trust funds could be deposited with the commercial or savings department of the bank. The court concluded the bank, as executor, was permitted to deposit estate funds in its own savings bank department. (At p. 686.) The bank was then authorized to mingle estate funds on deposit with other funds for its use in order to pay interest on the deposit. (*Id.,* at pp. 686-687.) Again, the bank was allowed the use of self-deposited funds to the same extent it was allowed the use of other funds deposited with it.

■ Probate Code section 16225, subdivision (e), allows self-depositing, without payment of interest, of funds necessary for the administration of the trust. Financial Code section 1562 allows self-deposit of funds awaiting investment or distribution. Neither statute requires the payment of interest on such deposits or limits the trustee's right to profit from the use of self-deposited funds.

■ Defendant also cites 3 Scott on Trusts (3d ed. 1967) section 203, pages 1661-1662: "Where a trust company is permitted to deposit funds awaiting investment in its own commercial department, the funds so deposited cease to be trust funds and become the individual property of the trust company, and it is not accountable for any profit it makes in its commercial department through the use of the funds. But where such a deposit is a breach of trust, the trustee is accountable for the profit so made." (Fns. omitted.) Similar is *Stahl* v. *First Pennsylvania Banking and Trust Co.* (1963) 411 Pa. 121 [191 A.2d 386]. That case holds a bank which self-deposits trust funds is not liable for profits made on the deposit, even where they are liable for interest thereon. (191 A.2d at p. 388.) 76 American Jurisprudence Second, Trusts, observes generally, when a bank self-deposits trust funds it need not maintain their separate identity and it is not liable for interest thereon merely from the use of such funds. (§ 373, p. 586.)

■ The foregoing authorities point to one conclusion. Where it is not a breach of trust for the trustee to self-deposit trust funds, the trustee is

permitted to profit from the use of such self-deposited funds. It is not a breach of trust to self-deposit trust funds where the funds are necessary for the administration of the trust or are awaiting investment or distribution. The trustee is not required to account to the trust's beneficiaries for the profit made on the use of self-deposited funds.

## C. Analysis

### 1. Self-pooling and Self-depositing

The trial court found it uncontroverted defendant used trust property in the three challenged practices—self-pooling and self-depositing, use of fail float and use of disbursing float. It found such use was permitted by federal and state self-deposit statutes, citing 12 United States Code section 92a(d); 12 Code of Federal Regulations section 9.10(b); Civil Code section 2261, subdivision (c); Probate Code section 920.5; Financial Code section 1562; *Estate of Buchman, supra,* 138 Cal.App.2d 228; and *Estate of Smith, supra,* 112 Cal.App. 680. The authorization to self-deposit was based on the recognition banks pool and invest in their own behalf small trust cash balances, the court found, citing *Estate of Smith,* and the bank had a duty to invest trust cash in high-yielding investments when available, citing *Conservatorship of Pelton, supra,* 132 Cal.App.3d 496.

The trial court further found the self-deposit statutes barred the imposition of the burden of proof on defendant to justify its conduct. In any event, defendant had explained and justified its conduct. The initial burden of proof was on plaintiffs to show the challenged practices were wrongful, and plaintiffs did not meet this burden. Plaintiffs were required to show the availability of any investments that would have yielded a higher rate of return to the trust accounts, which they failed to do. "That [defendant] pools and invests deposited [trust] funds for its own benefit is, without more, insufficient to shift the burden since that is the nature of banking." In dealing specifically with the issue of self-pooling, the trial court observed a bank-trustee's use of self-deposited trust funds is expressly permitted. Moreover, the trustee may keep sufficient cash on hand to make disbursements on behalf of the trust and to keep cash awaiting permanent investment. (*Lynch* v. *John M. Redfield Foundation* (1970) 9 Cal.App.3d 293, 298 [88 Cal.Rptr. 86, 51 A.L.R.3d 1284]; see Fin. Code, § 1562.) The court found no evidence defendant "permitted cash awaiting disbursement, distribution, or permanent investment to remain uninvested in any fiduciary account in a greater amount or for a longer period of time than reasonable under all the circumstances. Indeed, [defendant's] policies and practices were at all times designed to ensure that uninvested cash was minimized."

The trial court then discussed procedures relating to the short-term investment of cash awaiting permanent investment or distribution and not needed for immediate disbursements, i.e., the cash pooled from the trust accounts and self-deposited for the bank's own benefit. Such cash was invested in passbook savings accounts; there was no evidence of significant alternative short-term investment opportunities for small amounts of cash. Money market mutual funds, which allow short-term investment of small amounts of cash, were not in significant use until 1978 or 1979 and were not free from doubt as investments for trusts until mid-1983.

In March 1975, defendant began operating a fund called STIF (short-term investment fund) for its employee benefit trust accounts. In January 1976, defendant "implemented a fully automated short-term investment fund for its personal and court trust accounts called CAUF [(cash utilization fund)]. On a daily basis all principal cash in excess of $100 was 'swept' electronically from participating trust accounts into CAUF. Cash from the trust accounts was thus pooled and invested in large denomination money-market instruments purchased and administered by [defendant] for CAUF."

The trial court found defendant acted prudently in not developing CAUF earlier, in that the costs that would have been imposed on the trusts thereby would have exceeded the expected benefits. Further, defendant did not delay implementation of either STIF or CAUF to avoid the loss of trust cash deposits. Moreover, it was prudent for defendant to implement STIF first, in view of the simpler accounting required, smaller number of accounts involved and typically larger size of the accounts. The trial court also found it was reasonable to limit CAUF to amounts of money exceeding $100; lower sweep limits could not be easily accommodated by defendant's computer system and amounts left in the trust accounts under $100 "were *de minimus* insofar as affected beneficiaries were concerned."

Plaintiffs contended defendant could have developed and implemented an automated sweep of all trust cash earlier than it did. The trial court found defendant did not have the computer capacity to generate a sweep such as STIF or CAUF before 1975, and it timely acquired the hardware to implement the programs. In any event, defendant's PTA (personal trust accounting) system had to be modified before either STIF or CAUF could be implemented, and this modification could not be achieved until early 1975.

The trial court concluded, whether STIF or CAUF could be implemented sooner was not the point. Defendant "properly deposited trust cash with itself and was not under any obligation to return to the beneficiaries any benefit it derived from use of such funds."

Initially, defendant limited participation in CAUF to accounts in which principal and income were accounted for separately; only principal was swept into CAUF. CAUF was modified to "sweep all cash to the penny on a daily basis" in mid-1982. This modification was delayed by a failed attempt to upgrade some of defendant's trust systems; during the attempt, modification of other systems was put on hold. The trial court found it would have been neither prudent nor feasible to have included income cash in CAUF in 1976. This action would have delayed the start of CAUF by many months.

The trial court finally concluded defendant did not wrongfully self-deposit trust funds. Further, it properly invested short-term cash in its own savings accounts and later in CAUF.

Regarding defendant's disclosure of its practices, the trial court found defendant did not disclose its self-pooling and use of self-deposited trust funds. However, defendant "was under no obligation to disclose its practices, which, as discussed above, were proper and not in violation of any duty owed to the beneficiaries."

■ There are three ways in which, plaintiffs assert, defendant breached its fiduciary duties by self-depositing trust funds and failing to account to plaintiffs for the profits made thereon. First, plaintiffs complain of defendant's failure to institute an earnings credit system for the benefit of its trust accounts. The trial court found such a system would not have been feasible or cost effective.

■ In reviewing plaintiffs' assertion and the finding of the trial court, this court is governed by the substantial evidence rule; its power "begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805], italics deleted.) All evidence tending to establish the correctness of the finding and all inferences reasonably leading to the same conclusion will be accepted as true. (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602].) Factual matters will be viewed most favorably to and conflicts in the evidence will be decided in favor of the prevailing party. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

■ Furthermore, this court will presume the record contains sufficient evidence to support the finding of fact. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 [160 Cal.Rptr. 516, 603 P.2d 881]; *People* v. *Dougherty*

(1982) 138 Cal.App.3d 278, 282 [188 Cal.Rptr. 123].) The appellant " 'who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue.' " (*In re Marriage of Fink, supra,* 25 Cal.3d at p. 887.) The appellant may not simply recite evidence in his favor, but must set forth all material evidence. (*People* v. *Dougherty, supra,* 138 Cal.App.3d at p. 282.) Failure to do so waives the error. (*Ibid.*)

▇▇▇ Plaintiffs, in contending the trial court erred in finding an earnings credit system would have been infeasible and not cost effective, set forth only evidence supporting their contention, not any of the evidence to the contrary. On this basis, we may presume the record contains sufficient evidence to support the finding and hold plaintiffs waived their contention. Nevertheless, we will discuss the merits of plaintiffs' contention.

Plaintiffs also, in their argument, cite as evidence statements of the attorneys trying the case. ▇▇▇ It is elementary statements of the attorneys are not evidence. (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 283, p. 286; BAJI No. 1.02.)

▇▇▇ Turning now to the merits of plaintiffs' contention, the earnings credit is a credit to an account calculated monthly based on the average daily balance of the account. Witness Gordon William Collier managed Information Services within defendant's Treasury Management Services department. He produced Corporate Account Analysis statements for corporate customers having demand deposits with defendant; these statements are the basis for billing the corporate customers for services rendered. Mr. Collier testified earnings credits were applied to these accounts based on the account balances; they were calculated on a monthly basis.

The head of Treasury Management Services, James W. Putnam, testified the rate at which the earnings credit was applied was based on the Treasury Bill rate. The earnings credit could be used to offset fees for defendant's services to the corporate customers' accounts.

An earnings credit system was set up for one large trust account. Lucinda M. Smith worked on the Pacific Telephone Pension Plan account. She testified the account received an earnings credit on positive balances in its checking account. The credit reduced the charges to the account for services rendered to it.

The use of the earnings credit is limited to an offset of fees, in that it may not be paid as interest on demand deposits. 12 United States Code section 371a provides in pertinent part: "No member bank shall, directly or indi-

rectly, by any device whatsoever, pay any interest on any deposit which is payable on demand . . . ." 12 Code of Federal Regulations section 217.2 (Regulation Q) provides: "Except as provided by section 19 of the Federal Reserve Act, no member bank of the Federal Reserve System shall, directly or indirectly, by any device whatsoever, pay any interest on any demand deposit. . . . Within this part, any payment to or for the account of any depositor as compensation for the use of funds constituting a deposit shall be considered interest." Defendant cites two cases—apparently the only ones on the issue—which suggest uninvested trust funds deposited in a bank are demand deposits: *In re Kaufmann's Estate* (1939) 137 Pa.Super. 88 [8 A.2d 472, 474-475] and *In re Sonderling's Will* (1935) 155 Misc. 403 [279 N.Y.S. 703, 708].

A proposal to institute an earnings credit system on trust accounts was made in 1973. In a letter dated August 8, 1973, Vice President R. C. Hagen proposed to the Senior Vice President and Trust Officer to "[p]rovide within the Personal Trust Accounting system a program to calculate interest earned on the daily principal balance of uninvested funds of those trust accounts which would qualify for passbook savings accounts under Regulation Q." Mr. Hagen estimated it would cost $3,600 to develop a program to do this and would cost approximately $1.2 million per year in interest paid. There would be a savings of manpower which might total $40,000 per year. Mr. Hagen testified he received no response to his letter but heard comments such a plan would be illegal under Regulation Q, in that the funds were considered demand deposits.

Also contained in the record is a letter to Mr. Hagen from a systems analyst dated June 8, 1973. The letter sets forth the implementation cost for the proposal of $3,600. It also sets forth changes in existing systems that would have to be made before implementing the proposal, and it lists problems which would need to be resolved.

Dr. Mathew Joseph Klempa was plaintiffs' computer expert who testified regarding modifications of defendant's Personal Trust Accounting System. He testified an earnings credit could have been applied to principal and income cash balances in the trust accounts, and the technology to do this was in existence in 1969. He estimated it would have taken between 200 and 500 man-hours of analyst time to implement such a program. Dr. Klempa acknowledged his opinion only addressed the technical feasibility of implementing the program within the constraints of the Personal Trust Accounting (PTA) system, not the wisdom of implementing the program.

Daniel George Cerri is defendant's vice president of trust systems. He opined Dr. Klempa's proposed modification of the PTA system to provide earnings credits on principal and income cash balances would not work.

Dr. Gerald J. Burnett is an expert in the field of computer systems and systems such as are used in banking; he has done work for defendant. He believed the important question was not whether the technology existed in 1969 to apply earnings credits to trust account balances but whether it was a proper allocation of limited resources—programming time and effort—to make that application. He was of the opinion the sweep applied in 1976, CAUF, was a better program than earnings credits, in that it provides earnings on the trust account balances, not just payment of the fees charged.

Contrary to the showing made by plaintiffs, there is evidence which supports the inferences an earnings credit system for personal trust accounts was not feasible or cost effective; this evidence must be accepted as true. (*Board of Education* v. *Jack M., supra,* 19 Cal.3d at p. 697.) Any conflicts in the evidence, i.e., plaintiffs' evidence such a system was technologically feasible, must be resolved in favor of defendant. (*Nestle* v. *City of Santa Monica, supra,* 6 Cal.3d at pp. 925-926.) Hence, there is substantial evidence to support the finding of the trial court regarding the earnings credit system.

Plaintiffs' second complaint is that defendant could have instituted CAUF earlier than it did and could have included income cash in CAUF earlier than it did. In short, defendant should have invested all trust funds for plaintiffs' benefit as soon as it was feasible to do so.

It is well-established a trustee has the duty to invest funds (7 Witkin, Summary of Cal. Law (8th ed. 1974) § 62, p. 5423; accord, Prob. Code, § 16007), excluding those funds necessary for the orderly administration of the trust (Prob. Code, § 16225, subd. (e)). The same rule applies to executors or administrators. (Prob. Code, § 920.3.) However, the trustee need not invest sums too small to be prudently invested. (76 Am.Jur.2d, Trusts, § 378, p. 591.) As stated in *Estate of McCabe* (1950) 98 Cal.App.2d 503, 505 [220 P.2d 614], "A trustee must invest money, as fast as collected *in sufficient amount,* so as to afford reasonable interest thereon." (Italics added.)

Plaintiffs first point to evidence that by the end of 1974 there were approximately 70 STIF's with total assets of $2.7 billion and there were 20 money market funds with assets of $2.465 billion. Plaintiffs do not show how these facts establish a breach of duty on the part of defendant. There is no evidence as to how those STIF's operated, and on what type of accounts. Additionally, there is no evidence cited showing investment in the existing money market funds would have been considered prudent on the part of defendant as trustee.

Moreover, there is evidence the first automated sweep in the country was not put into effect until mid-1975. This sweep was used only on principal cash. The system took 10 to 15 people approximately 6 months to develop; adding the time it took to test the system, it took approximately 10 man-years to develop the system.

Plaintiffs assert it is uncontroverted the technology used in STIF and CAUF was in existence in 1969; Dr. Klempa so testified. He saw no reason, "from a hardware and software point of view," why the systems could not have been implemented in 1969.

Dr. Burnett viewed the key question as not whether the technology existed to implement STIF or CAUF, but whether defendant's business judgment would allow development of the systems, i.e., whether it should be given priority in the "allocation of a scarce resource, namely, programmers." There were at the time other programs which had priority.

Other witnesses testified defendant's computers were operating at capacity until approximately May 1974, when new computer equipment was received; no new jobs—such as CAUF—could have been added. Overnight processing of PTA data could not have begun until February 1975. CAUF was then instituted in January 1976. It reasonably may be inferred the new computer equipment and the overnight processing capability were necessary to the implementation of CAUF.

There are two letters which plaintiffs claim show defendant delayed implementation of CAUF to keep revenues earned on trust funds for as long as possible. One, dated June 19, 1975, from Frank J. Caulfield, vice president of Trust Administration, to the executive vice president of Trust Administration, was a "status report on the development of a cash fund for personal trusts." The letter concludes: "the new fund is projected for implementation by mid December. However, if the experience with STIF can be taken as a precedent, its start will be postponed at least until January 1976 in order to reduce the impact on bank deposits at year's end." The second, an October 21, 1975, letter from Mr. Caulfield to the senior vice president of Trust Administration, suggests that the cash investment fund be titled "Cash Investment Trust (CAIT), pronounced Kate, rhymes with LATE." The trial court found these letters were the "product of a sardonic sense of humor" and did not establish defendant delayed the implementation of CAUF. Plaintiffs point to no evidence to the contrary.

We conclude plaintiffs wholly fail to establish the lack of substantial evidence to support the trial court's findings regarding the implementation of CAUF on principal cash. It may be presumed the record contains

sufficient evidence to support the finding. (*In re Marriage of Fink, supra,* 25 Cal.3d at p. 887.) That finding—defendant acted prudently in not developing CAUF earlier, in that the cost of such investment would have exceeded the expected benefits—comports with the rule a trustee need not invest such funds as are too small to be prudently invested (76 Am.Jur.2d, *supra,* § 378, p. 591; see *Estate of McCabe, supra,* 98 Cal.App.2d at p. 505).

As to the use of CAUF on income cash, Dr. Klempa testified the technology existed to make such a use in 1969. Dr. Burnett testified, once again, the key question was whether scarce resources should have been allocated to the development of such a program. He opined an income sweep very likely would have delayed implementation of CAUF on principal in 1976. Defendant did not want to further delay the use of CAUF; moreover, there were other programs which had priority over the development of CAUF for income.

George J. Benston, defendant's expert in banking, financial markets and institutions, accounting and economics, testified it would have been a bad decision to have developed an income cash sweep before mid-1982. The transaction cost of investing the income would have exceeded the gain made on the investment.

There was evidence of the attempts of various employees of defendant to have CAUF extended to income cash. Howard E. Ritt, a senior vice president, in a January 15, 1980, letter, points out defendant's policy "to minimize the amount of principal and income cash held uninvested in personal and court trust accounts to the fullest extent compatible with [its] existing accounting technology," recognizing, "however, that the limitations of manual origination of entries require the establishment of de minimus levels of activity." He notes CAUF "manages very effectively and automatically the principal cash balances" in certain trusts, but "[n]o program exists for the investment of *income* cash," and "these investments must be initiated manually." (Italics original.) He further notes it has been "urged repeatedly that a CAUF program be established for eligible income cash. This should be given a very high priority for completion as an emergency item because of the inherent potential liability."

It was defendant's policy to distribute income cash to the beneficiaries as rapidly as possible. This minimized the time it was held uninvested. In some cases, income cash was invested manually on behalf of the trusts.

Janet Elliott worked in several of defendant's trust departments. In 1979 she became involved with an effort to develop an enhancement of CAUF to automatically sweep income cash into the fund. She submitted a service

request on January 18, 1980, proposing that CAUF or a similar program which would automatically invest income cash be implemented. The benefit of such a program, she wrote, was: "To provide cash management of income cash. The Trust Department is already involved in legal action for lacking this ability." Ms. Elliott discovered a similar request had earlier been submitted, also referring to the lawsuit to impress upon the systems people the request required priority and attention. She testified the project gained higher priority as time progressed. A number of proposals were put forth, and a number of people became involved in the project. CAUF for income cash ultimately went into effect in mid-1982.

Plaintiffs imply defendant dragged its feet in the implementation of CAUF for income, despite the pendency of this action. A letter dated January 1, 1981, from Finance, Accounting and Administration regarding priorities of projects and ongoing activities gives 18 projects or ongoing activities higher priority than the development of CAUF for income cash. However, other evidence shows defendant had a number of people working on development of the system, considering various proposals as to how to implement it, and the project gained priority as time progressed.

Moreover, there was evidence implementation of CAUF for income cash would not have been a prudent investment until mid-1982, when it was implemented. The cost of investing the income cash would have exceeded the gain to be made therefrom. As previously stated, a trustee need not invest trust funds too small to be prudently invested. (76 Am.Jur.2d, *op. cit. supra,* § 378, p. 591; see *Estate of McCabe, supra,* 98 Cal.App.2d at p. 505.)

Thus, there is substantial evidence to support the trial court's finding. Defendant included a sweep of income cash in CAUF when it was prudent and feasible to do so.

■ The third way in which, plaintiffs contend, defendant breached its fiduciary duties is by failing to disclose to plaintiffs its challenged practices. Plaintiffs assert defendant should have notified them of the conflict of interest arising from the practice of self-depositing, of the additional compensation defendant was receiving as a result of the practice, and of alternative practices which would return to plaintiffs the value of the use of the trust funds, rather than to defendant.

The trial court found defendant breached no duty of disclosure to plaintiffs. Its practices were proper and violated no duty owed to plaintiffs. Moreover, defendant did send out statements on the accounts in question showing activity in the accounts, from which defendant's use of account funds was apparent.

First, plaintiffs complain of defendant's failure to disclose the conflict of interest arising from the practice of self-depositing. They analogize to the case of *S. E. C.* v. *Capital Gains Bureau* (1963) 375 U.S. 180 [11 L.Ed.2d 237, 84 S.Ct. 275]. That case deals with investment advisors, who are recognized as fiduciaries of their clients. (At p. 194 [11 L.Ed.2d at pp. 247-248].) The court held investment advisors may be required to make full disclosure to their clients of the practice of personally trading in the securities recommended to their clients in order to make a profit therefrom. (*Id.,* at pp. 196-197 [11 L.Ed.2d at p. 249].) An investor must be permitted to evaluate the advisor's conflicting motivations, to decide whether the advisor "is serving 'two masters' or only one, 'especially . . . if one of the masters happens to be economic self-interest.'" (*Id.,* at p. 196 [11 L.Ed.2d at p. 249].)

Here, however, the self-deposit statutes revealed how defendant could use plaintiffs' trust funds. The account statements showing account activity plus common knowledge about banks' use of funds deposited in certain types of accounts made defendant's use of trust funds clear. For example, the statements would reveal if trust funds were being held in passbook savings accounts with defendant; it is common knowledge banks use such funds in addition to paying interest thereon.

Second, plaintiffs claim defendant should have disclosed to plaintiffs the total compensation it was taking for its services as trustee, including that earned through self-depositing. They analogize to *In the Matter of E.F. Hutton & Company, Inc.* (S.E.C. 1984) [1984-1985 Transfer Binder] Fed. Sec. L. Rep. ¶ 83,718, p. 87,196. Hutton Investment Series, Inc. (HIS) was an investment company with E.F. Hutton & Company, Inc. (Hutton) as its investment advisor and distributor of its shares. Hutton received payment for the purchase of shares of HIS at the time of entry of orders for the purchases, but the payment was not forwarded to HIS until five business days after the entry of the orders. Thus, Hutton received a "material financial benefit" from the use of the purchase money prior to its being forwarded to HIS. (*Id.,* at p. 87,197.) The Securities and Exchange Commission censured Hutton, in part, for engaging in "transactions, practices and courses of business which operated as a fraud or deceit upon HIS and its shareholders. As a part of this conduct, Hutton failed to disclose to HIS and its independent directors that it was receiving additional compensation as a result of its possession and use of funds paid to it for the purchase of HIS shares and that, at the time the independent directors recommended shareholder approval of the advisory agreement, they had not been informed by Hutton of the additional compensation it was receiving." (*Ibid.*)

The situation is different here, however. As previously mentioned, account activity was revealed and defendant's use of account funds in certain circumstances was understood.

Plaintiffs finally claim defendant should have disclosed to them various alternatives for the use of their trust funds such as earnings credits or STIP's (short-term investment pools) which would have returned to plaintiffs the value of the use of the trust funds. In support of this claim, plaintiffs rely on a series of "give-up" cases, dealing with commissions for sales of securities: *Moses* v. *Burgin* (1st Cir. 1971) 445 F.2d 369, certiorari denied (1971) 404 U.S. 994 [30 L.Ed.2d 547, 92 S.Ct. 532]; *Fogel* v. *Chestnutt* (2d Cir. 1975) 533 F.2d 731, certiorari denied (1976) 429 U.S. 824 [50 L.Ed.2d 86, 97 S.Ct. 77]; *Arthur Lipper Corp.* v. *S. E. C.* (2d Cir. 1976) 547 F.2d 171, certiorari denied (1978) 434 U.S. 1009 [54 L.Ed.2d 752, 98 S.Ct. 719]; *Tannenbaum* v. *Zeller* (2d Cir. 1977) 552 F.2d 402, certiorari denied (1977) 434 U.S. 934 [54 L.Ed.2d 293, 98 S.Ct. 421]; and *Fogel* v. *Chestnutt* (2d Cir. 1981) 668 F.2d 100, certiorari denied (1982) 459 U.S. 828 [74 L.Ed.2d 66, 103 S.Ct. 65].

Stock exchanges set commission rates with no discount based on quantity of stocks purchased. Brokers competing for the business of mutual funds were willing to "give-up" a portion of their commissions because of the size of many of the mutual fund transactions. These "give-ups" did not result in a refund to the mutual funds, in that "anti-rebate" rules prevented rebates or discounts to the customer which would bring the net commission paid to brokers below a minimum level. The "give-ups" were instead paid to brokers who sold shares of the mutual funds to the public.

In *Moses* v. *Burgin, supra,* plaintiff, a mutual fund shareholder, contended the "give-up" practices lost brokerage commissions which could have been recaptured for the benefit of the fund; the practices instead benefited the management and owners of the fund, who used fund assets to their advantage; and the fund's board never considered recapturing the "give-ups" because management improperly withheld relevant information. The court held management owed a duty of full disclosure "in every area where there was even a possible conflict of interest between their interests and the interests of the fund." (445 F.2d at p. 376.) This duty was breached. (*Id.,* at p. 378.) A later case holds the duty of disclosure includes the duty to make full disclosure of the opportunities available to the mutual fund. (*Fogel* v. *Chestnutt, supra,* 668 F.2d at p. 112.)

In the instant case, no duty to disclose alternatives could have been breached. As defendant argues, the alternative practices suggested by plaintiffs were initially unworkable or imprudent. Once they became workable and prudent, they were adopted. Accordingly, defendant breached no duty of disclosure.

## 2. *Fail Float*

In discussing fail float, the trial court first described defendant's practices and the types of fail float. When purchasing and selling trust securities, defendant debited or credited the trust accounts on a contractual settlement date, five business days after the trade date. This occurred whether or not defendant received the purchased stocks or the funds for stocks sold. Purchase funds were held in a securities suspense account, at defendant's disposal, until the securities were delivered; a suspense asset account was debited when funds from an outside purchaser did not arrive on time for trust securities sold. The two practices are known as purchase fail float and sale fail float, respectively.

These practices are consistent with generally accepted accounting principles. The evidence shows such practices "(1) vastly simplif[y] accounting and computer programming for securities transactions and income collection; and (2) insulate[] individual trust accounts from the uncertainty and confusion of 'back office problems' which have long plagued the securities industry." Moreover, they give the beneficiary an accurate picture of trust account assets.

The trial court found the evidence permitted the inference that for any given account at any particular time, purchase fail float may have exceeded sale fail float. However, net fail float was favorable to the trusts and adverse to defendant; sale fail float exceeded purchase fail float by a substantial margin.

The trial court noted plaintiffs' contention purchase fail float was a "trust asset," the earnings on which should have been credited to the appropriate trust account. But the trial court found "[t]his one-sided approach ignores what is clearly a *two*-sided accounting convention, and it cannot withstand reasonable cost/benefit analysis." Moreover, plaintiffs suggested no meaningful or practical alternatives to defendant's practices.

In conclusion, the trial court found defendant's practices were reasonable, adopted for operational reasons, not to produce "hidden income," and any income earned on the purchase fail floats was more than offset by the expense of advances on the sale fail floats. Defendant's practices were not wrongful, defendant could not have returned to plaintiffs the value of its use of fail float and it was under no duty to do so.

Plaintiffs contend it was improper to offset purchase fail float with sale fail float. Using trust purchase money from the settlement date until the securities were delivered violated defendant's duty of loyalty. On the other

hand, they claim, there is no prohibition against advancing money to the trust from the sale of securities when the money has not arrived by the settlement date. Further, that defendant's procedures were adopted in good faith cannot justify the practice.

However, Probate Code section 16225, subdivision (e), allows the trustee to "hold[ ] an amount of trust property reasonably necessary for the orderly administration of the trust in the form of cash or in a checking account without interest." The judgment shows the trial court found defendant's holding of trust funds in a noninterest-bearing account as purchase fail float was reasonably necessary for the orderly administration of the trusts. In the absence of any showing by plaintiffs on appeal that there is not substantial evidence to support this conclusion, this court will presume the record contains sufficient evidence to support the conclusion. (*In re Marriage of Fink, supra,* 25 Cal.3d at p. 887; *People v. Dougherty, supra,* 138 Cal.App.3d at p. 282.)

Defendant was allowed to use funds in the securities suspense liability account awaiting delivery of the securities. As previously discussed, Probate Code section 16225, subdivision (e), allows self-deposit of such funds. Therefore, defendant's practices regarding fail float were not wrongful or a breach of defendant's duty of loyalty to plaintiffs.

### 3. *Disbursing Float*

In discussing disbursing float, the trial court first defined the practice. When a check is issued to pay trust obligations, it is issued from a central disbursing account and the trust account is immediately charged therefor. Defendant conceded the check would not clear for at least 24 hours, if not longer. In the interim before the check clears, the funds to cover it are placed in a pool which is available to defendant for use.

The trial court found this practice "accords with generally accepted accounting principles and is an application of the rule permitting a trustee to keep cash on hand to pay upcoming expenses of the account. The obligation of the trust, for which the check is issued, is extinguished and becomes [defendant's] obligation. The trust check is virtually the same as a cashier's check since [defendant], by issuing the check, has already accepted it for payment. As is true of a cashier's check, a trust check is almost a form of money and may be cashed immediately. Hence, [defendant] must ensure that it has funds available for payment of the check at the time it is issued."

The trial court found alternative practices would not be feasible, or would be costly and impractical. Nor would it be feasible "to invest the daily

balances attributable to outstanding trust checks on behalf of the trusts for which the checks are written." Defendant, for a fee, was able to invest check float on behalf of some of its corporate accounts. However, the trial court found the cost and operational changes necessary to develop this practice for the trust department were unreasonable and unworkable.

The trial court noted, "A significant portion of disbursing float is attributable to distribution checks held uncashed by beneficiaries." Defendant offered the beneficiaries the option of direct deposit of distribution checks into checking or savings accounts with defendant. This option does away with disbursing float on distribution checks.

In conclusion, the trial court found defendant could not have returned to plaintiffs the value of the use of disbursing float. Moreover, it was not obligated to do so.

As the trial court observed, a trustee is allowed to keep on hand cash necessary to pay upcoming expenses of the trust. (*Estate of Whitney* (1926) 78 Cal.App. 638, 644 [248 P. 754]; 90 C.J.S., Trusts, § 339, p. 586; see Prob. Code, § 16225, subd. (e).) The trustee need not pay interest on such funds. (*Ibid.*) And as previously discussed, the bank-trustee may profit from the use of such funds by means of self-deposit.

The trial court found, it may be inferred, the use of disbursing float was reasonably necessary to the orderly administration of the trust accounts. Once again, plaintiffs make no showing to the contrary, and it may be presumed there is substantial evidence to support the trial court's finding. (*In re Marriage of Fink, supra,* 25 Cal.3d at p. 887; *People* v. *Dougherty, supra,* 138 Cal.App.3d at p. 282.) Hence, defendant's practices regarding disbursing float were not wrongful or a breach of the duty of loyalty to plaintiffs.

### 4. *Burden of Proof*

Where a beneficiary seeks relief for a breach of trust, the beneficiary has the initial burden of proving the existence of a fiduciary duty and the trustee's failure to perform it. (Bogert, Trusts & Trustees (rev. 2d ed. 1982) § 871, p. 123.) The burden then shifts to the trustee to justify its actions. (*Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 108; *Remillard Brick Co.* v. *Remillard-Dandini, supra,* 109 Cal.App.2d 405, 420; see also *Conservatorship of Pelton, supra,* 132 Cal.App.3d 496, 502.)

The trustee must show the use of due care, diligence and skill with respect to trust investments. (76 Am.Jur.2d, Trusts, § 619, p. 831.) In short,

the trustee must prove it acted with the utmost good faith toward the beneficiary and made full disclosure of all facts related to the transactions at issue. (See *Smith* v. *Zak* (1971) 20 Cal.App.3d 785, 793 [98 Cal.Rptr. 242].)

■ As previously mentioned, the trial court found the self-deposit statutes barred the imposition of the burden of proof on defendant and, in any event, defendant had justified its conduct. Plaintiffs failed to meet their initial burden of proof to show defendant's challenged practices were wrongful. The trial court noted "the discussion of 'burden of proof' is academic; this is not a case that hinges on the burden of proof for its resolution. [Defendant] has adequately explained and justified its conduct."

The trial court correctly allocated the burden of proof initially to plaintiffs, then to defendant. Whether or not plaintiffs met their initial burden of proving the three challenged practices—self-pooling, use of fail float and use of disbursing float—were a breach of defendant's duty of loyalty, defendant met its burden by justifying the practices.

## II

Plaintiffs also contend the trial court erred in finding no fraud, unjust enrichment or unfair competition. The contention lacks merit.

The trial court found none of defendant's challenged practices was wrongful. Therefore, defendant did not commit fraud, and there was no unjust enrichment. Further, defendant's practices did not constitute unfair competition within the meaning of Business and Professions Code section 17200.

### A. *Fraud*

■ Civil Code section 1573, subdivision 1, provides in pertinent part that constructive fraud consists of "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault . . . , by misleading another to his prejudice . . . ." A breach of fiduciary duty is considered fraud. (*Estate of Shay* (1925) 196 Cal. 355, 365 [237 P. 1079]; *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 32 [136 Cal.Rptr. 378]; *Moe* v. *Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 306 [98 Cal.Rptr. 547].) ■ Inasmuch as defendant breached no duty owed to plaintiffs, it was not guilty of fraud. The trial court did not err in finding no fraud.

### B. *Unjust Enrichment*

■ Under the theory of unjust enrichment, the law implies a promise to return money wrongfully obtained. (See, e.g., *Ward* v. *Taggart* (1959) 51

Cal.2d 736, 742 [336 P.2d 534].) The basis of the action is the equitable principle "a person should not be allowed to enrich himself at the expense of another." (*Major-Blakeney Corp.* v. *Jenkins* (1953) 121 Cal.App.2d 325, 339 [263 P.2d 655].) Unjust enrichment "presupposes the acceptance and retention of a benefit by one party with full appreciation of the facts, under circumstances making it inequitable for the benefit to be retained without payment of the reasonable value thereof." (*Id.,* at p. 340.) Once unjust enrichment is found, the aggrieved party must be returned to his former position by the return of the money unjustly retained. (*Holmes* v. *Steele* (1969) 269 Cal.App.2d 675, 678 [75 Cal.Rptr. 216].)

■ Any profit defendant derived from the use of plaintiffs' trust funds was legal and not obtained by a breach of trust. Therefore, the trial court did not err in finding there was no unjust enrichment.

### C. *Unfair Competition*

Business and Professions Code section 17200 provides "unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising . . . ." A private party may sue to enjoin such practice, and the court may order restitution of money acquired by means of unfair competition. (Bus. & Prof. Code, §§ 17203, 17204.) Defendant's business practices were not unlawful, unfair or fraudulent. Thus, the trial court did not err in finding defendant did not engage in unfair competition in violation of section 17200.

### III

■ Plaintiffs assert summary judgment erroneously was granted as to custodial agency accounts. We disagree.

A motion for summary judgment properly is granted where the "affidavits, declarations, admissions, answers to interrogatories, depositions and matters of which judicial notice shall or may be taken . . . show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subds. (b), (c).) The basic facts regarding the custodial agency accounts are not in dispute; the dispute centers on the legal significance of these facts.

The custodial agency accounts are set up pursuant to a Letter of Instructions; two different forms of the letter were used during the relevant time period. Both forms of the letter provide defendant shall: (1) hold all securities deposited with it; (2) purchase and sell securities; (3) "hold, disburse or invest" income and principal; (4) send periodic statements of receipts and

disbursements; and (5) charge fees set out elsewhere; the letters also provide each party has the right to terminate their relationship upon written notice to the other.

Walter Ladage is defendant's assistant vice president and trust officer in the custody section and responsible for most of the custodial agency accounts. He pointed out defendant, as custodian, has no discretionary authority to invest and does not invest or distribute custodianship cash unless and until directed to do so by the principal. The principal may direct immediate disbursement of all cash received, in which case no cash is held in the custodial agency account. If the principal directs the bank to hold cash pending further instructions, or if the principal fails to give any instructions, the cash is credited to the custodial account and remains available for investment or withdrawal upon demand.

Jeffrey L. Howarth is defendant's financial controller of the trust department. He testified uninvested cash held in custodial agency accounts is classified as a demand deposit. It is available for defendant's use in its business, included in defendant's general funds and considered a debt due the custodial agency accounts. Similarly, the funds in savings and time accounts held on behalf of custodial agency accounts are available for defendant's use.

The trial court found, in ruling in defendant's favor on its motion for summary judgment, plaintiffs failed to state a cause of action against defendant with regard to the custodial agency accounts. Specifically, defendant, "in holding and investing funds deposited and received into the custodianship accounts, (a) acted at the direction of account principals and (b) in using in its banking business which those principals authorized and directed it to hold as demand, savings and time deposits, [defendant] (i) did not breach any fiduciary duty owed to those principals and (ii) had no fiduciary duty to 'disclose' such use because of the principals' express directions, because it is the accepted custom in the local banking community for banks to use in their business custodianship funds placed in demand, savings and time deposits, and because it is common knowledge that banks use such general deposits." The trial court further found defendant "had no discretionary authority or fiduciary duty" to invest custodianship funds, and it had no fiduciary duty to disclose the availability of such investments.

Plaintiffs, in asserting the trial court erred in granting summary judgment to defendant, cite agency principles, characterizing the relationship between defendant and the principals of the custodial agency accounts as a fiduciary one. ▇ Plaintiffs essentially rely on the principle an agent is a fiduciary who owes to his principal the same duty of diligent and faithful service

imposed on a trustee. (*Spector* v. *Miller* (1962) 199 Cal.App.2d 87, 95 [18 Cal.Rptr. 426].) The agent is a fiduciary with respect to matters within the scope of the agency (Rest.2d Agency, § 13), and the agent's duties include "the duty to account for profits arising out of the employment, the duty not to act as, or on account of, an adverse party without the principal's consent . . . , and the duty to deal fairly with the principal in all transactions between them." (*Ibid.*, com. a.)

The agent owes the principal the duty of fullest disclosure of material facts concerning a transaction which might affect the principal's decision thereon. (*Rattray* v. *Scudder* (1946) 28 Cal.2d 214, 223 [169 P.2d 371, 164 A.L.R. 1356]; accord, Rest.2d Agency, § 381.) The agent must disclose whether it is acting on its own account or as an adverse party to the principal. (*Rattray, supra,* at pp. 224-225; Rest.2d Agency, §§ 389, 390.) The duty extends to all facts likely to affect the principal's judgment. (*Rattray, supra,* at pp. 224-225; Rest.2d Agency, § 390.) ██ Plaintiffs assert that this duty, in the instant case, required defendant to disclose to the principals of the custodial agency accounts the fact it was using and profiting from the cash proceeds deposited in the accounts.

The agent also has, as previously stated, "the duty to account for profits arising out of the employment." (Rest.2d Agency, § 13, com. a.) Thus, any profit made by an agent in connection with transactions conducted by it on behalf of the principal is owed to the principal. (*Bank of America* v. *Ryan* (1962) 207 Cal.App.2d 698, 705-706 [24 Cal.Rptr. 739]; Rest.2d Agency, § 388.)

As discussed in part I, *ante,* the agent "is not permitted to make any secret profit out of the subject of his agency. [Citations.] All benefits and advantages acquired by the agent as an outgrowth of the agency, exclusive of the agent's agreed compensation, are deemed to have been acquired for the benefit of the principal, and the principal is entitled to recover such benefits in an appropriate action. [Citation.]" (*Savage* v. *Mayer, supra,* 33 Cal.2d 548, 551.)

According to the foregoing principles, plaintiffs assert defendant was prohibited from using custodianship funds for its own profit. Also in support of this assertion, plaintiffs interestingly cite the Restatement Second of Agency section 427, comment a, which reads: "If, while holding . . . money [collected] for the principal, [the agent] makes a profit thereby, he has a duty to account for it." The comment further reads, however, "It may be understood that an agent who has collected money becomes a debtor to the principal for the amount collected . . . , in which case he *is not liable* for the profits made by its use. This is ordinarily true of a bank which has

collected negotiable instruments, and which, in the ordinary course of business, credits the account of the depositor." (*Ibid.,* italics added.) It is on this latter principle defendant relies.

The relationship between a bank and a depositor depends upon the type of deposit made—whether it is a general deposit or a special one. " 'When money or its equivalent is deposited in a bank without any special agreement, the law implies that it is to be mingled with the other funds of the bank, the relation of debtor and creditor is created between the bank and the depositor, and the deposit is general. In such a transaction the bank becomes the owner of the fund. When, on the other hand, money or its equivalent is so deposited with an accompanying agreement that the identical thing deposited shall be returned, or that the same shall be paid out for a specific purpose, the relation thus created is not that of debtor and creditor. Such a transaction is a special deposit, and the bank is liable only as bailee. In such a case the fund is a trust fund . . . , according to the special contract by which the deposit is made.' " (*Cabrera* v. *Thannhauser & Co.* (1920) 183 Cal. 604, 607-608 [192 P. 45].)

Where the deposit is general, the bank may use deposited funds to its own profit. "It is axiomatic that the relationship between a bank and its depositor arising out of a general deposit is that of a debtor and creditor. [Citations.] Such a deposit is in effect a loan to the bank. [Citation.] Title to the deposited funds passes immediately to the bank which may use the funds for its own business purposes. [Citations.] The bank does not thereby act as trustee and cannot be charged with converting the deposit to its own use. [Citations.] It is, however, obligated to pay the debt reflected by the balance of the deposited funds upon its depositor's demand. [Citations.]" (*Morse* v. *Crocker National Bank* (1983) 142 Cal.App.3d 228, 232 [190 Cal.Rptr. 839].)

A bank making collections on behalf of a depositor "is presumptively entitled to use the proceeds as its own. This is the regular custom of banks and indeed they could hardly do business in any other way. While the bank holds something other than cash it may well be held to be a trustee of what it holds; but when cash comes into its hands it is not normally to be expected that the bank should keep the cash as a separate fund, in the absence of an agreement that it should do so." (5 Scott on Trusts (3d ed. 1967) § 534, p. 3713.) The bank from the moment of collection becomes a debtor and the depositor a creditor. (*Ibid.*)

The situation is different in the case of a formal trust. As trustee, the bank may not use trust property as its own and become a mere debtor; doing so is a breach of trust. (*Id.,* at pp. 3712-3713.) It is presumed, how-

ever, in general that the bank may use collected proceeds as its own; this presumption may be rebutted only by evidence of an agreement or understanding the proceeds should be held as a trust fund.

██ California authority is in accord with the principles set out in Scott, *supra. Duggan* v. *Hopkins* (1956) 147 Cal.App.2d 67 [304 P.2d 823] states: "It is well settled that from the moment of collection of an item by a bank, the relationship of debtor and creditor arises, if no instructions have been given which show an intent on the part of the customer to keep the proceeds of the collection separate from the general funds of the bank." (At p. 70.) For the deposit to be considered special it must be shown that was the intent of the parties; otherwise, the deposit will be deemed general. (*Bank of America* v. *Board of Supervisors* (1949) 93 Cal.App.2d 75, 80 [208 P.2d 772].) Even if a trust relationship exists when an item is deposited for collection with the bank, "it may be changed by the manner of remitting the proceeds of the collection into that of debtor and creditor, according to custom." (9 Cal.Jur.3d, Banks and Other Financial Institutions, § 94, p. 300, fns. omitted.)

It may safely be said the deposit of securities into a custodial agency account creates a trust relationship. The question is whether that relationship survives the collection of the proceeds on the sale of the securities, whether the deposit of such proceeds may be considered general, changing the relationship into that of debtor and creditor. Further, if the relationship changes, was defendant required to disclose that fact—and the fact of its use of the cash proceeds for its own profit—to the principals of the custodial agency accounts?

While there are no California cases on point, there is one out of Illinois. In *Bieze* v. *Coca* (1977) 54 Ill.App.3d 7 [11 Ill.Dec. 652, 369 N.E.2d 106], a receiver for a pension plan and trust deposited with defendant bank United States Treasury Bonds for collection. The receipt under which the deposit was made provided: " 'This bank's services are limited to holding the securities in safekeeping for the depositor and dealing with them as herein expressed unless otherwise agreed in writing.' " (369 N.E.2d at p. 109.) It also provided the bank could disburse the collected proceeds only in accordance with the directions of the depositor trustees. The bank presented the bonds for collection and received the proceeds, which it credited to the depositor trustees' demand account. The bank never received instructions as to the disbursement of the proceeds, and they remained in the demand account for over four years. The bank did not pay interest and used the deposited proceeds as its own.

The court first noted the relationship between a bank and its depositor is created by an express or implied agreement between them, and an agree-

ment the bank may act merely as the depositor's agent is binding upon them. (*Id.*, at p. 112.) The court then observes: "Where a bank has received a deposit for collection, the bank's agency status terminates upon collection and credit to an account of the depositor." (*Ibid.*) At that point, a debtor and creditor relationship arises between the bank and the depositor. (*Ibid.*) The bank was thus permitted to profit by the use of the depositor's funds. (*Ibid.*, citing Rest.2d Agency, § 427, com. a.) Therefore, the bank acted properly and was not required to account for profits made on the collected proceeds. (*Bieze, supra,* at p. 113.)

Following *Bieze,* section 427 of the Restatement Second of Agency, and the other authorities cited by defendant, it may be concluded that a bank making collections for a depositor remains an agent of the depositor only until it collects cash proceeds from the collection. At that point, the agency relationship terminates as to the bank's handling of the cash proceeds, and a debtor and creditor relationship is established. Therefore, the bank using the collected funds is not making a "secret profit out of the subject of [its] agency." (*Savage* v. *Mayer, supra,* 33 Cal.2d at p. 551.)

Plaintiffs argue, however, the Letters of Instructions under which defendant operated as an agent did not permit defendant to use for its own profit cash proceeds deposited with it following the sale of securities. They did not allow defendant to cease being a fiduciary and become a debtor upon deposit of cash proceeds, inasmuch as they provided the agency relationship could be terminated only upon written notice to the principals. Plaintiffs also point out an agent may not define the scope of the agency by itself. (Civ. Code, § 2322.) They contend defendant defined the scope of its agency by unilaterally terminating the agency relationship upon receipt of the cash proceeds.

While an agent cannot unilaterally change a trust relationship to that of debtor and creditor, that relationship may be changed by custom or agreement. (*Hing* v. *Lee* (1918) 37 Cal.App. 313, 316 [174 P. 356].) Ultimately, the relationship "will be determined by the intention of the parties as shown by the circumstances of the transaction or by the instructions of the depositor." (*Powell* v. *Bank of America* (1942) 53 Cal.App.2d 458, 463 [128 P.2d 123], italics deleted; accord, Rest.2d Agency, § 376; 1 Scott & Fratcher, The Law of Trusts (4th ed. 1987) § 8.1, p. 98.) The bank's duty as agent is limited to the scope of the agency set forth in the parties' agreement. (*Meyers* v. *Guarantee Sav. & Loan Assn.* (1978) 79 Cal.App.3d 307, 312 [144 Cal.Rptr. 616]; see *Luckehe* v. *First Nat. Bk. of Marysville* (1924) 193 Cal. 184, 187-188 [223 P. 547].)

The Letters of Instructions in the instant case provide defendant shall "hold, disburse or invest the income and principal funds received by

[it] in accordance with [the principal's] written directions to [it]." They do not specify how the cash is to be held. It may be inferred, however, the cash may be held as demand, savings and time deposits; this is customarily how cash awaiting disbursement or investment would be held by a bank.

The letters do not provide the cash is to be held in trust or as a special deposit. The cash deposits may therefore be deemed general (*Bank of America* v. *Board of Supervisors, supra,* 93 Cal.App.2d at p. 80) and defendant allowed to use them as its own (*Cabrera* v. *Thannhauser & Co., supra,* 183 Cal. at pp. 607-608). Thus, the scope of the agency extends only to the collection of cash proceeds; after that, the agency ends and a debtor and creditor relationship commences and defendant is allowed to use and profit from the cash proceeds.

The question remains, however, whether defendant breached any duty of disclosure owed to the principals of the custodial agency accounts. As previously discussed, the agent must disclose whether it acts on its own account or adversely to the principal in a transaction connected with its agency. (*Rattray* v. *Scudder, supra,* 28 Cal.2d at pp. 224-225; see Rest.2d Agency, §§ 381, 389, 390.) But here, defendant did not act in its own interest or adversely to the principals in a transaction *connected with its agency*; defendant so acted after the termination of the agency relationship.

■ The agent also must disclose to the principal "information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have . . . ." (Rest.2d Agency, § 381.) This duty exists if the agent "has notice of facts which, in view of his relations with the principal, he should know may affect the desires of his principal as to his own conduct . . . ." (*Ibid.,* com. a.)

■ Even under the foregoing standard, defendant had no duty to disclose to the principals of the custodial agency accounts its use of custodianship cash. First, by virtue of the Letters of Instructions, the principals were aware that cash might be held uninvested, in a demand, savings or time deposit. Second, as previously stated, it is the regular custom of banks to use collections placed in such accounts as its own, and "it is not normally to be expected that the bank should keep the cash as a separate fund, in the absence of an agreement that it should do so." (5 Scott, *op. cit. supra,* § 534, p. 3713.) No such agreement was present here. Hence, the principals should have expected defendant to use custodianship cash as its own.

Defendant breached no duty owed to principals of custodial agency accounts by using cash proceeds of the sale of securities for its own profit or

by failing to disclose this fact to the principals. Therefore, the trial court did not err in granting summary judgment on this issue to defendants.

## IV

Plaintiffs further assert the trial court erred in concluding none of the challenged practices was unlawful with respect to "no-power" agency and trust accounts. We cannot agree.

The trial court found none of the challenged practices was unlawful as to "no-power" accounts for the same reason they were not unlawful as to trust accounts. Additionally, none of the challenged practices was unlawful for the reasons set forth in the summary judgment as to custodial agency accounts.

Plaintiffs point to no evidence in the record which describes these accounts, defendant's relationship to the principals or beneficiaries of the accounts or the scope of that relationship. They point to no evidence which shows the trial court was incorrect in its ruling. Therefore, it must be presumed the record contains sufficient evidence to support the court's findings. (*In re Marriage of Fink, supra,* 25 Cal.3d at p. 887; *People* v. *Dougherty, supra,* 138 Cal.App.3d at p. 282.)

## V

 Plaintiffs aver the trial court committed reversible error per se by depriving them of their constitutional entitlement to a jury trial. The averment lacks merit.

The case originally was set for a jury trial. Defendant moved to vacate the setting for jury trial on the ground the action was equitable. The trial court agreed and vacated the setting by jury trial.

 Preliminarily, it should be noted defendant claims if plaintiffs were serious about their right to a jury trial they would have pursued a writ after the trial court's ruling. While the better practice is to seek review of such a ruling by writ, saving the time and expense of a court trial if a jury trial improperly was denied, the ruling may be reviewed on appeal from the judgment. (*Selby Constructors* v. *McCarthy* (1979) 91 Cal.App.3d 517, 522-523 [154 Cal.Rptr. 164]; cf. *De Castro* v. *Rowe* (1963) 223 Cal.App.2d 547, 562 [36 Cal.Rptr. 53].)

 "The right to trial by jury is a basic and fundamental part of our system of jurisprudence. (Cal. Const., art. I, § 16; [Citation.].) As such, it

should be zealously guarded by the courts [citation]. In case of doubt therefore, the issue should be resolved in favor of preserving a litigant's right to trial by jury. [Citations.]" (*Byram* v. *Superior Court* (1977) 74 Cal.App.3d 648, 654 [141 Cal.Rptr. 604]; accord, *Titan Group, Inc.* v. *Sonoma Valley County Sanitation Dist.* (1985) 164 Cal.App.3d 1122, 1127-1128 [211 Cal.Rptr. 62].) Denial of the right to trial by jury is an act in excess of the court's jurisdiction and is reversible error per se. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 363, p. 365; see *Heim* v. *Houston* (1976) 60 Cal.App.3d 770, 774 [131 Cal.Rptr. 755]; *De Castro* v. *Rowe, supra,* 223 Cal.App.2d at p. 563.)

■■■ Where the action is one at law, there is a right to a jury trial. (See *C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1, 9 [151 Cal.Rptr. 323, 587 P.2d 1136].) There is no entitlement to a trial by jury in an equitable action. (See *ibid.*) Where a complaint states both legal and equitable causes of action, plaintiffs are entitled to a jury trial on the legal causes of action. (*Connell* v. *Bowes* (1942) 19 Cal.2d 870, 871 [123 P.2d 456].)

■■■ The essence of plaintiffs' contention is that, although equitable principles are involved in the case, the action is one for legal relief, i.e., damages. Relying on the principle "the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded" (*Raedeke* v. *Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 672 [111 Cal.Rptr. 693, 517 P.2d 1157]), plaintiffs contend they were therefore entitled to a jury trial. This contention applies to their first through fifth causes of action, for breach of fiduciary duty and fraud.

Plaintiffs also point out, in actions against fiduciaries, a plaintiff may have the option of pursuing either legal or equitable remedies. Thus, the beneficiary of a trust need not pursue trust property when the trustee has breached the trust but may seek a personal judgment against the trustee. (*McElroy* v. *McElroy* (1948) 32 Cal.2d 828, 831 [198 P.2d 683]; *Fields* v. *Michael* (1949) 91 Cal.App.2d 443, 448 [205 P.2d 402].) Plaintiffs contend they are not seeking a return of the trust property but rather are seeking a personal judgment against defendant.

Plaintiffs cite *Mortimer* v. *Loynes* (1946) 74 Cal.App.2d 160 [168 P.2d 481] as illustrative of the foregoing principles. The action was one for breach of fiduciary duty and the relief requested was a specific sum of money out of which, it was alleged, plaintiff was defrauded. The conduct of defendants was measured by a standard consisting of equitable principles. (At p. 167.) The court ruled: "From the fact that equitable principles are thus used to establish the alleged liability of the defendants, it does not

necessarily follow that the action to enforce that liability is equitable. The law courts now recognize and apply many equitable principles and grant relief based thereon where, as here, legal relief is sought in the form of a judgment for a specific amount. [Citations.] None of the extraordinary powers of a court of equity are required in order to give plaintiff the relief that he seeks. A court of law can afford complete relief. It is thus apparent that this action is one at law. [Citations.]" (*Id.*, at p. 168.)

Also relied upon is *Ripling* v. *Superior Court* (1952) 112 Cal.App.2d 399 [247 P.2d 117]. The case again holds even where equitable principles are involved, if the cause of action is one where legal relief could be granted, the right to trial by jury is preserved. (At p. 402.) An equitable action to enforce a trust " 'has in contemplation the terms, conduct, and management of the trust, the settlement of the trustee's accounts, compensation to the trustee, the order of payment over and his discharge from his trusteeship.' " (*Id.*, at p. 406, quoting from *Austin* v. *Wilcoxson* (1906) 149 Cal. 24, 26 [84 P. 417].) However, " '[i]f the trustee is under a duty to pay money immediately and unconditionally to the beneficiary, the beneficiary can maintain an action at law against the trustee to enforce payment.' " (*Ripling, supra,* at p. 404, quoting from Rest.2d Trusts, § 198, subd. 1.)

Section 197 of the Restatement Second of Trusts provides: "Except as stated in § 198, the remedies of the beneficiary against the trustee are exclusively equitable." The question, then, is whether plaintiffs' action falls within the exception stated in section 198, as adopted in *Ripling*.

■ In order to maintain an action at law, the liability of the trustee must be definite and clear, with no accounting necessary to establish it, such as where the trustee is under an immediate and unconditional duty to pay money to the beneficiary. (3 Scott, *op. cit. supra,* § 198, p. 1631; Bogert, *op. cit. supra,* § 870, pp. 101-102.) An action at law also may be maintained if an accounting has been had and the balance due the beneficiary completely ascertained. (60 Cal.Jur.3d, Trusts, § 315, p. 490.)

Where an accounting is required, the action is equitable. (*Kritzer* v. *Lancaster* (1950) 96 Cal.App.2d 1, 6 [214 P.2d 407]; see *Verdier* v. *Superior Court* (1948) 88 Cal.App.2d 527, 530 [199 P.2d 325].) An accounting is necessary where the fiduciary becomes liable for various sums of money and plaintiffs do not know what money is due them. (*Kritzer, supra,* at pp. 6-7; *Brea* v. *McGlashan* (1934) 3 Cal.App.2d 454, 460 [39 P.2d 877].) "Where there is a fiduciary relationship . . . and the facts are peculiarly within the knowledge of one of the parties . . . an accounting lies." (*Keeble* v. *Brown* (1954) 123 Cal.App.2d 126, 133 [266 P.2d 569]; accord, *Smith* v. *Blodget* (1921) 187 Cal. 235, 242 [201 P. 584].)

In the instant case, defendant was not under an immediate and unconditional obligation to pay plaintiffs. The amount of defendant's liability to plaintiffs, if any, was not definite and clear and would have to be established by an accounting. This indicates the action is equitable rather than legal.

Moreover, the action is concerned with the " 'terms, conduct, and management of the trust.' " (*Ripling* v. *Superior Court, supra,* 112 Cal.App.2d at p. 406.) Plaintiffs are challenging the manner in which defendant conducted itself with regard to the trust property. This too indicates the action is one in equity rather than at law. (*Ibid.*)

While plaintiffs sought damages, that fact by itself does not make the action one at law. As noted in *C & K Engineering Contractors* v. *Amber Steel Co., supra,* 23 Cal.3d at page 9: "Although we have said that 'the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded' (*Raedeke* v. *Gibraltar Sav. & Loan Assn., supra,* 10 Cal.3d 665, 672), the prayer for relief in a particular case is not conclusive, [citations]. Thus, 'The fact that damages is one of a full range of possible remedies does not guarantee . . . the right to a jury . . . .' [Citation.]" An action is one in equity where the only manner in which the legal remedy of damages is available is by application of equitable principles. (*C & K Engineering Contractors, supra,* at p. 10.)

As plaintiffs' second amended complaint shows, damages is one of the remedies sought; the others were equitable. However, as previously discussed, the only way in which the remedy of damages could be afforded was by the application of equitable principles, i.e., an accounting. Thus, the fact plaintiffs sought money damages did not make an equitable action into one at law. (*Ibid.*) Accordingly, we conclude plaintiffs' action is one in equity, not at law, and plaintiffs were not entitled to a jury trial.

## VI

Finally, plaintiffs aver the trial court erred in limiting the class to beneficiaries and principals of accounts subject to the jurisdiction of the Los Angeles County Superior Court. We disagree.

In their first amended complaint, plaintiffs alleged they represented a class consisting of beneficiaries of fiduciary accounts "whose administration is or at the times mentioned was subject to the jurisdiction of the courts of the State of California." Defendant demurred. The trial court sustained the demurrers, in part, ruling: "although defendant's demurrers do not separately attack the jurisdiction of the [Los Angeles County Superior Court]

over a putative class of beneficiaries whose trusts are properly administered in counties other than Los Angeles, defendant does demur on the authority of [Probate Code sections 301 and 1120, subdivision (a)] . . . . The court concludes that these sections and [section] 1138.3 preclude it from entertaining the action for the benefit of any beneficiaries of testamentary or *inter vivos* trusts whose administration is, or within the statutory period has been, or should be under the administration of a superior court other than the [Los Angeles County Superior Court]." The court then dismissed the action as to all beneficiaries whose trusts were not properly administered by the Los Angeles County Superior Court. Plaintiffs amended their complaint to allege a class of beneficiaries whose trusts were properly administered by the Los Angeles County Superior Court. Three years later, plaintiffs moved for reconsideration of the ruling on the demurrers; the trial court denied the motion.

Defendant asserts plaintiffs have waived any challenge to the court's ruling regarding the class of beneficiaries to be joined in this action. ■ It is well established the election to amend a complaint after a demurrer thereto has been sustained "waives any error in the ruling sustaining the demurrer." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 940, pp. 375-376; accord, *Brittan v. Oakland Bank of Savings* (1896) 112 Cal. 1, 2 [44 P. 339]; *Gale v. Tuolumne Water Co.* (1859) 14 Cal. 25, 28; *Prichard v. Reitz* (1986) 178 Cal.App.3d 465, 467 [223 Cal.Rptr. 734]; *Sheehy v. Roman Catholic Archbishop* (1942) 49 Cal.App.2d 537, 540 [122 P.2d 60].) ■ It is clear plaintiffs, by amending their first amended complaint after defendant's demurrers were sustained, waived any error in the trial court's ruling limiting the class of beneficiaries to be joined in the action.

■ Plaintiffs contend they properly waited to challenge the ruling on the demurrers on appeal from the judgment, in accordance with the "one final judgment" rule. This rule precludes appeal from interlocutory or other nonappealable orders until a final judgment has been entered. (*DeGrandchamp v. Texaco, Inc.* (1979) 100 Cal.App.3d 424, 436 [160 Cal.Rptr. 899].) Where the rule is not statutory (Code Civ. Proc., § 904.1), it is "a product of appellate policy, which deprecates piecemeal appeals in order to conserve appellate energies." (*Ibid.*; *Guntert v. City of Stockton* (1974) 43 Cal.App.3d 203, 208 [117 Cal.Rptr. 601].)

However, the statutory embodiment of the "one final judgment" rule, Code of Civil Procedure section 904.1, provides an order of dismissal is appealable where it finally disposes of the action. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 699 [63 Cal.Rptr. 724, 433 P.2d 732].) This includes a situation in which the complaint is dismissed as to certain parties. (*Seidner*

v. *1551 Greenfield Owners Assn.* (1980) 108 Cal.App.3d 895, 901-902 [166 Cal.Rptr. 803].) Thus, appeal from the trial court's order of dismissal following defendant's demurrers would not run afoul of the "one final judgment" rule.

Plaintiffs also contend amendment of a complaint should be allowed with liberality at any stage of the proceedings pursuant to Code of Civil Procedure section 473. This contention is irrelevant; the question is not whether plaintiffs should have been allowed to amend their complaint but whether they waived their challenge to the ruling on defendant's demurrers.

We conclude plaintiffs did waive their challenge to the ruling on defendant's demurrers by amending their complaint in response to the ruling. Hence, the trial court did not err in limiting the class of plaintiffs to those whose accounts were subject to the jurisdiction of the Los Angeles County Superior Court.

*On Cross-appeal*

## VII

 Defendant contends the trial court erred in ruling costs should be borne by the entire class of plaintiffs on a pro rata basis. We agree.

Following trial, defendant filed its memoranda of costs. Plaintiffs filed a motion to tax costs, also claiming the costs should be allocable against the entire class, not just the named plaintiffs. The trial court denied the motion to tax costs but ruled the costs should be borne by the entire class of plaintiffs. It found imposition of costs on the named plaintiffs "would be inequitable and impose an inappropriate chilling effect on class actions."

 Code of Civil Procedure section 1032 gives the trial court discretion whether or not to award costs under certain circumstances. Such discretion exists where, as here, the action is equitable in nature. (*Wheeler* v. *First National Bank* (1937) 10 Cal.2d 185, 190-191 [73 P.2d 889].) It is abused " ' "whenever it may be fairly said that in its exercise the court . . . exceeded the bounds of reason . . . ." ' " (*Heckmann* v. *Ahmanson* (1985) 168 Cal.App.3d 119, 125-126 [214 Cal.Rptr. 177].)

 Defendant contends it was an abuse of discretion to allocate costs against the entire class; defendant relies, in the main, on the dissenting opinion in *Civil Service Employees Ins. Co.* v. *Superior Court* (1978) 22 Cal.3d 362 [149 Cal.Rptr. 360, 584 P.2d 497]. In that case, defendant sought a writ to compel the superior court to vacate a pretrial order direct-

ing defendant to bear the initial expense of notifying absent class members of the pendency of the action; the writ was denied. The dissent considered the order amounted to a taking of property without due process of law. It then discussed how defendant would recover its costs if it ultimately prevailed in the action, finding a pro rata approach would be manifestly unfair. (At p. 383, dis. opn. of Clark, J.) The dissent stated: "It would be patently inequitable to permit defendant to recover against potential class members who received notice and chose to opt out of the litigation—frequently realizing that the game is not worth the candle. Defendant's recovery would be no less unfair as to those class members who chose not to incur the expense of consulting an attorney and who did not have the foresight to opt out. Indeed, the mind is boggled by the possibility that defendant would record its judgment for notice costs against the class and proceed to enforce it by execution or garnishment against each member's home or personal property, constantly increasing the costs of a class member who took no part in the litigation. Plaintiff may not be permitted to use without consent the resources or credit of unnamed class members to finance the action." (*Ibid.*)

The dissent in *Civil Service Employees Ins. Co.* speaks to the unfairness of charging unnamed class members for litigation in which they took no part. It also points out the mind-boggling costs which would be incurred in attempting to collect costs from the entire class.

Another case cited by defendant is *Lamb* v. *United Security Life Company* (S.D.Iowa 1973) 59 F.R.D. 44, which holds pursuant to Federal Rules of Civil Procedure, rule 23 members of a class who do not opt out of litigation and are bound by the judgment are nevertheless not "parties" who are liable for costs assessed against the named plaintiffs. (59 F.R.D. at pp. 48-49.) Inasmuch as the decision was based on a federal statute, it cannot be applied to the instant case. Plaintiffs point out the rationale of *Lamb* was rejected in *Com. of Pa.* v. *Local Union 542, etc.* (E.D.Pa. 1980) 507 F.Supp. 1146, 1160, affirmed (3d Cir. 1981) 648 F.2d 923 (reversed on other grounds in *General Building Contractors Assn.* v. *Pa.* (1982) 458 U.S. 375 [73 L.Ed.2d 835, 102 S.Ct. 3141].)

*Wright* v. *Schock* (9th Cir. 1984) 742 F.2d 541 holds, "Absent class members have no obligation to pay attorneys' fees and litigation costs, except when they elect to accept the benefit of the litigation." (At p. 545.) *Gay* v. *Waiters' & Dairy Lunchmen's U., Local No. 30* (N.D.Cal. 1980) 86 F.R.D. 500 suggests the named plaintiffs are liable for costs, although costs may be recovered from the unnamed plaintiffs: "Presumably, a judgment for costs against the class could, at least in theory, be asserted in individual collection actions against unnamed (but identified) class members. [Citation.] In practice, the expense of bringing such actions is likely to be prohib-

itive, given the small amount usually at stake. Because the representative plaintiffs are themselves jointly and severally liable for the whole amount, there would normally be little incentive to pursue other class members. [Citations.]" (At p. 502, fn. 3.) The case also notes the class representatives' dilemma—they must balance the risk of liability against their potential recovery. (*Id.,* at pp. 502, 504.)

Focusing on the foregoing dilemma, and the effect it may have on the willingness to undertake to prosecute a class action suit, plaintiffs analogize to *Estate of Beach* (1975) 15 Cal.3d 623 [125 Cal.Rptr. 570, 542 P.2d 994]. In *Beach,* three of four residuary trust beneficiaries contested the first account filed by the executor of the decedent's estate; the trial court charged the cost of the unsuccessful contest against the contestants' shares only. On appeal, the court ruled pursuant to Probate Code section 750, costs of defending the contest were chargeable to the residuary trust "without differentiation as to the burden to be borne by any beneficiary's particular interest." (At p. 645.) Further, the trial court had no authority to impose the entire cost burden on the contestants. (*Id.,* at p. 646.) The court noted, "A contrary rule would unduly deter contestants such as these from questioning the stewardship of executors and administrators through proceedings brought in good faith." (*Ibid.*)

As defendant points out, the imposition of the cost burden on the entire class of plaintiffs (1) increases the costs of the litigation and such costs may be prohibitive, and (2) is unfair to unnamed plaintiffs who took no part in the litigation. While imposition of the entire cost burden on the named plaintiffs may have a chilling effect on the willingness of plaintiffs to bring class action suits, this effect easily may be outweighed by the potential recovery. All potential litigants must weigh costs of suit against likelihood of success and possible recovery before deciding to file suit. Those who choose to take the risks of litigation should be the ones who bear the cost when they are unsuccessful, not those who did not make the choice. (See *Civil Service Employees Ins. Co.* v. *Superior Court, supra,* 22 Cal.3d at p. 383 (dis. opn. of Clark, J.).) Accordingly, we conclude the trial court did abuse its discretion in ruling costs should be borne by the entire class of plaintiffs.

Plaintiffs, having lost on appeal and cross-appeal, normally would be required to bear costs. (Cal. Rules of Court, rule 26(a).) However, this court has the inherent power to alter the normal course of events when the interests of justice require it. (*Ibid.*; *Bell* v. *Board of Supervisors* (1976) 55 Cal.App.3d 629, 637 [127 Cal.Rptr. 757]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 669, p. 644.) Although plaintiffs have lost the battle, they have won the war; defendant—at least in part spurred on by this lawsuit—has changed its practices to afford plaintiffs the benefits sought by this

lawsuit. Under the circumstances, it would be inequitable to impose further costs upon plaintiffs. (*Bell, supra,* at p. 637.)

The judgment is affirmed. The order imposing all costs upon the entire class of plaintiffs is reversed. Each party to bear its own costs.

Hanson, J., and Devich, J., concurred.

The petitions of plaintiffs and appellants for review by the Supreme Court were denied November 30, 1988. Lucas, C. J., and Panelli, J., did not participate therein. Mosk, J., was of the opinion that the petitions should be granted.